IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

OHIO VALLEY ENVIRONMENTAL
COALITION,
COAL RIVER MOUNTAIN WATCH, and
NATURAL RESOURCES DEFENSE COUNCIL,

Plaintiffs,

v.                                                            CIVIL ACTION NO.  3:03-2281

DANA R. HURST, Colonel, District
Engineer, U. S. Army Corps of Engineers,
Huntington District, and
ROBERT L. VAN ANTWERP, Lieutenant
General, Chief of Engineers and
Commander of the U. S. Army Corps
of Engineers,

Defendants.

## MEMORANDUM OPINION AND ORDER

This case involves several environmental groups' challenge to the Army Corps of Engineers'

("Corps") decision to issue a nationwide permit, NWP 21, authorizing the discharge of dredged and

fill material associated with surface coal mining activities, which includes mountaintop mining.

Under this controversial method of mining, coal seams running through the upper fraction of a

mountain, ridge, or hill are reached by blasting and removing each layer of rock above the seam. The

mountain is demolished layer by layer as each layer of rock and coal is removed until the cost of

proceeding exceeds the value of the remaining coal.  During this process, the removed rock is placed

in adjacent valleys and, once the coal is extracted, replaced in an attempt to recreate the contour of

1

the mountain. *See Bragg v. W. Va. Coal Assoc.*, 248 F.3d 275, 286 (4th Cir. 2001). This dirt and rock, called overburden or spoil, "swells" or increases in size by as much as 25%, creating excess material not needed to rebuild the mountain. *Id.* As Judge Haden explained, "[t]he overburden . . . is disposed of by creating valley fills, that is, literally, filling the valleys with waste rock and dirt." *Kentuckians for the Commonwealth, Inc. v. Rivenburgh* ("*Rivenburgh I*"), 204 F. Supp. 2d 927, 929-30 (S.D. W. Va. 2002). These valley fills permanently eliminate previously existing valley streams. In the past twenty years, thousands of miles of streams in Appalachia, constituting over 2% of the streams in the area, have been impacted by the discharges associated with mountaintop mining. Draft Programmatic Environmental Impact Statement at III.D-2 (2003) ("DPEIS"). In West Virginia alone, over 200 miles of streams have been permanently lost. DPEIS at III.K-49.

The Corps indirectly manages this process through a nationwide permitting process. A nationwide discharge permit authorizes discharges from all activities, nationwide, within an identified category. A complex statutory framework undergirds and constrains the Corps' decision to issue a nationwide permit. Section 404 of the Clean Water Act ("CWA"), 33 U.S.C. § 1344, for instance, requires the Corps to determine that the activities in the authorized category would only have minimal environmental impacts, both individually and cumulatively. Another statute, the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4332(2)(C), requires the Corps to take a "hard look" at the environmental impacts of a project and prepare an environmental impact statement before issuing a nationwide permit unless it determines that the activities authorized by the permit will only result in insignificant environmental impacts.

In the course of issuing NWP 21 in the year 2007, the Corps determined, as required by CWA, that the activities authorized by that permit would only have minimal cumulative

environmental impacts.  The Corps also decided not to prepare an environmental impact statement, as required by NEPA, because it determined that the permitted activities would not result in significant environmental impacts.  I **FIND** that these determinations were arbitrary and capricious under the Administrative Procedures Act ("APA"), 5 U.S.C. § 706for the following reasons.

First, the Corps' NEPA analysis did not include a consideration of the ongoing impacts of past actions, are part of NWP 21's cumulative impacts.  Second, both the Corps' NEPA and CWA cumulative impacts determinations relied on the success of a mitigation process to minimize the cumulative impacts of NWP 21, but the Corps did not provide a rational explanation for its reliance. The Corps also provided no evidence that the mitigation process would be successful or adequately enforced.  Accordingly, the Corps' determinations were unsupported by the administrative record and were arbitrary and capricious.  NWP 21 (2007) is **VACATED** and **REMANDED** to the Corps for further proceedings.

## I.     Background

This case is one in a long line of lawsuits initiated by environmentalists against the coal industry and governmental regulators challenging practices and permit decisions related to mountaintop mining, or surface coal mining, in Southern Appalachia.[1]  As I have stated, those challenges arise from the detrimental impact those methods of mining have on the valley streams. As Judge Haden explained in greater detail:

---

[1]     *See, e.g.*, *Ohio Valley Envtl. Coal. v. U.S. Army Corps of Eng'rs,* 479 F. Supp. 2d 607 (S.D. W. Va. 2007) ("*OVEC Huntington*"), *rev'd,* 556 F.3d 177 (4th Cir. 2009); *Ohio Valley Envtl. Coal. v. Kempthorne*, 473 F.3d 94 (4th Cir. 2006); *Ohio Valley Envtl. Coal. v. Bulen* ("*OVEC I*"), 410 F. Supp. 2d 450 (S.D. W. Va.  2004), *aff'd in part, vacated in part*, 429 F.3d 493 (4th Cir. 2005); *Kentuckians for the Commonwealth, Inc. v. Rivenburgh*, 204 F. Supp. 2d 927 (S.D. W. Va.  2002), *rev'd,* 317 F.3d 425 (4th Cir. 2003); *Bragg v. Robertson*, 54 F. Supp. 2d 635 (S.D. W. Va. 1999).

> The normal flow and gradient of the stream is now buried under millions of cubic yards of excess spoil waste material, an extremely adverse effect. If there are fish, they cannot migrate. If there is any life form that cannot acclimate to life deep in a rubble pile, it is eliminated. No effect on related environmental values is more adverse than obliteration. Under a valley fill, the water quantity of the stream becomes zero. Because there is no stream there is no water quality.

*Bragg v. Robertson*, 54 F. Supp. 2d 635, 661-62 (S.D. W. Va. 1999), *aff'd in part, vacated in part*, 248 F.3d 275 (4th Cir. 2001).

The Corps, the defendant in this suit,[2] indirectly regulates the mountaintop mining industry via § 404 of CWA. This case involves a challenge to the Corps' evaluation of the environmental impacts associated with a specific § 404 nationwide permit: NWP 21.

### A.    Statutory Framework

As I have stated, in order to issue a permit authorizing valley fill, the Corps must satisfy the requirements of two statutes: CWA and NEPA. The purpose of CWA is to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). CWA authorizes the Secretary of the Army, acting through the Corps, to regulate discharges of dredged and fill material into the waters of the United States by issuing either individual or general permits. 33 U.S.C. § 1344. Individual permits for the discharge of dredged or fill material from specific disposal sites are authorized on a case-by-case basis pursuant to § 404(a). The issuance of an

---

[2]    The named defendants in this case have changed since the plaintiffs filed the initial complaint. The plaintiffs originally brought this action against Col. William Bulen, the Corps' District Engineer for the Huntington District, and Lt. Gen. Robert B. Flowers, the Chief of Engineers and Commander of the U.S. Army Corps of Engineers. The plaintiffs' Supplemental Complaint, filed on June 5, 2007, substituted Lt. Gen. Robert L. Van Antwerp and Col. Dana R. Hurst as defendants for Lt. Gen. Flowers and Col. Bulen, respectively [Docket 204]. Because their actions are attributed to the Corps itself, I will refer to these defendants collectively as "the Corps."

individual permit requires extensive individual review, notice, and an opportunity for public hearing.  33 U.S.C. § 1344(a); 40 C.F.R. § 230.5.

Unlike individual permits that only authorize discharges from a specific site, general permits are issued on a state, regional, or nationwide basis.  33 U.S.C. § 1344(e).  Pursuant to CWA § 404(e), general permits authorize the discharge of dredged or fill material for an entire category of activities.  33 U.S.C. § 1344(e).  The purpose of § 404(e)'s general permits is to reduce administrative paperwork and delay and, according to the Corps, to permit the agency to "authorize minor activities that are usually not controversial and would result in little or no public or resource agency comment if they were reviewed through the standard permit process."  Final Notice, 67 Fed. Reg. 2020, 2022 (Jan. 15, 2002).  CWA requires that the Corps determine, before issuing a general permit, that "the activities in [the general permit's] category are similar in nature, will cause only minimal adverse environmental effects when performed separately, and will have only minimal cumulative adverse effect on the environment."  33 U.S.C. § 1344(e)(1).  Further, like individual permits, general permits may only be issued after the Corps provides notice and an opportunity for public hearing.  13 U.S.C. § 1344(e).  The general permits must also be issued in accordance with the § 404(b)(1) Guidelines.  Id. § 1344(e)(1); 40 C.F.R. §§ 230.1-.7.  Under the Corps' regulations, the Corps must also conduct a review of twenty public interest factors identified in the Corps' regulations.  33 C.F.R. § 320.4.  After issuance of the general permit by the Corps, however, individual projects that comply with the terms of the general permit may proceed without further action by the Corps or public notice.  40 C.F.R. § 230.5.  Nationwide permits (which are one type of general permits) generally expire after five years.   33 C.F.R. § 330.6(b).

When issuing a nationwide permit, the Corps must also comply with the terms of NEPA. NEPA requires federal agencies to consider the environmental consequences of their actions and to allow public participation in the decision-making process.  Unlike CWA, NEPA does not mandate particular substantive results such as a finding of minimal adverse impacts, but rather requires federal agencies to take a "hard look" at the environmental consequences of an action and to "disseminat[e] . . . relevant environmental information for public comment so that the general public may be an active participant in the decisionmaking process." *OVEC Huntington,* 479 F. Supp. 2d at 625.  Towards those ends, NEPA requires federal agencies to prepare environmental impact statements ("EIS") for actions that will have a significant impact on the environment.  42 U.S.C. § 4332(2)(C).

To determine whether an action will have a significant environmental impact and thus require an EIS, an agency first decides whether the action is one that normally does require an EIS, or is categorically excluded from requiring an EIS.  40 C.F.R. § 1501.4(a).  If the agency cannot readily determine whether an action will significantly affect the environment, then it must prepare an environmental assessment ("EA") that discusses the proposed action, alternatives, and the environmental impacts of the proposed action and its alternatives.  40 C.F.R. §§ 1501.4, 1508.9. An EA is a "concise public document" that "provide[s] sufficient evidence and analysis for determining whether to prepare an [EIS] or finding of no significant impact."  40 C.F.R. § 1508.9(a).  The EA must address the direct, indirect, and cumulative impacts of the proposed action.  *Id.* § 1508.9(b); *see also* 40 C.F.R. §§ 1508.7, 1508.8, 1508.9.  If the EA reveals that the project will have a significant effect on the quality of the human environment, then the Corps must prepare a detailed, written EIS.  42 U.S.C § 4332(2)(C).  If the Corps determines that its proposed

6

action will not have a significant effect on the environment, then it need not prepare an EIS but may instead issue a Finding of No Significant Impact ("FONSI").  40 C.F.R. §§ 1508.4, 1508.13.  "An agency's decision to issue a FONSI and not prepare an EIS is a factual determination."  *Greater Yellowstone Coal. v. Flowers*, 359 F.3d 1257, 1274 (10th Cir. 2004) (quoting *Utah Shared Access Alliance v. U.S. Forest Serv.*, 288 F.3d 1205, 1213 (10th Cir. 2002)).  A FONSI must be supported by a statement of reasoning and evidence.  40 C.F.R. § 1508.13.   This NEPA process serves to "prevent uninformed agency action."  *OVEC Huntington,* 479 F. Supp. 2d at 625; *see also* 42 U.S.C. § 4332(2)(C).

### B.    Nationwide Permit 21

NWP 21, the nationwide permit at issue in this case, permits:

> Discharges of dredged or fill materials into waters of the United States associated with surface coal mining and reclamations operations provided the activities are already authorized, or are currently being processed as part of an integrated permit processing procedure, by the Department of Interior (DOI), Office of Surface Mining (OSM), or by states with approved programs under Title V of the Surface Mining Control and Reclamation Act of 1977.

(Corps' Mem. Opp'n OVEC's Mot. Summ. J. Supplemental Compl., Ex. 1, Decision Document: Nationwide Permit 21 at 1.)[3]  NWP 21 requires project proponents to file a pre-construction notification ("PCN") with the Corps and receive written authorization from the Corps prior to the initiation of a project.  *Id.*  The permit is also subject to general conditions which apply to all nationwide permits.  *Id.*  Under NWP 21, the Corps' district engineers consider each project on a case-by-case basis, determine whether the terms and conditions of NWP 21 are met, and evaluate whether the project's adverse environmental effects are both individually and cumulatively minimal.  Final Notice, Reissuance of Nationwide Permits, 72 Fed. Reg. 11092, 11095 (March 12,

---

[3]        Hereinafter, I will cite to this document as "2007 Decision Document."

2007) (explaining PCN review process).  If the district engineer determines that all the conditions of the permit are met and that the proposed project will not cause more than a minimal adverse effect on the aquatic environment, then the district engineer may authorize the project and associated fill.

### C.    Procedural History

The plaintiffs, a collection of environmental groups (hereinafter collectively referred to as "OVEC"),[4] brought this action challenging the Corps' decision in the year 2002 to issue NWP 21[5] on the basis that the nationwide permit did not comply with the terms of CWA; that the Corps failed to comply with NEPA when issuing the permit; and that the Corps acted arbitrarily and capriciously in violation of the APA,  5 U.S.C. § 706(2)(A).  (Am. Compl. ¶¶ 52-56.)

In my prior Memorandum Opinion and Order, granting OVEC's first motion for summary judgment, I held that the Corps' issuance of NWP 21 (2002) conflicted with the unambiguous meaning of § 404(e) of CWA.  I found that "[s]ection 404(e) of the [CWA] authorizes the Corps to issue nationwide permits only for those activities determined *before* issuance to have minimal environmental impacts."  *OVEC I*, 410 F. Supp. 2d at 453.  Accordingly, I further found that NWP 21's structure, which provides for authorizations based on a case-by-case, *post hoc* determination of minimal impacts for each proposed project, permitted an authorization *procedure* rather than a category of activities.  I thus held that the Corps failed to permit a category of activities and make a pre-issuance minimal impacts determination as required by CWA.  *OVEC I*, 410 F. Supp. 2d at 467.

---

[4]      The plaintiffs in this case include: Ohio Valley Environmental Coalition, Coal River Mountain Watch, and the Natural Resources Defense Council.

[5]      I will refer to the nationwide permit issued in 2002 as "NWP 21 (2002)."

8

The Fourth Circuit Court of Appeals reversed and remanded, finding that the Corps made the required minimal impact determinations prior to issuing NWP 21 (2002). *Ohio Valley Envtl. Coal. v. Bulen* ("*OVEC II*"), 429 F.3d 493, 505 (4th Cir. 2005). The Court of Appeals held that NWP 21 (2002) did not simply define a procedure but rather authorized a category of activities. *Id.* at 498. The Court of Appeals further held that the Corps may rely on post-issuance measures to "cement" its pre-issuance minimal impact determination,[6] but could not rely *only* upon post-issuance measures.[7] *Id.* at 501. Because the Corps had "undertak[en] a good-faith, comprehensive, pre-issuance review of the anticipated environmental effects of the activities authorized by NWP 21 [(2002)]" in addition to its *partial* reliance on post-issuance procedures, the Court of Appeals found that the Corps *had* made a minimal impacts determination under CWA § 404(e). *Id.* at 502.

---

[6]     The Court of Appeals stated:

> given the inevitable ex ante uncertainty the Corps confronts when issuing a nationwide permit, its reliance on post-issuance procedures is a reasonable, if not the only possible, way for it to cement its determination that the projects it has authorized will have only minimal environmental impacts.

*OVEC II*, 492 F.3d at 501.

[7]     The Court of Appeals explained:

> In concluding that section 404(e) permits the Corps to rely in part on post-issuance procedures to make its pre-issuance minimal-impact determinations, we do not suggest that section 404(e) permits the Corps *completely* to defer the minimal-impact determinations until after issuance of the permit. We would have substantial doubts about the Corps' ability to issue a nationwide permit that relied solely on post-issuance, case-by-case determinations of minimal impact, with no general pre-issuance determinations. In such a case, the Corps' "determinations" would consist of little more than its own promise to obey the law.

*Id.* at 502 (emphasis in original).

9

The Court of Appeals left open, however, the question of whether the Corps' minimal impact determination was arbitrary and capricious.  In a footnote, the Court of Appeals stated:

> It is of course open to the plaintiffs on remand to reassert their argument that the Corps' minimal-impact determination was arbitrary and capricious because the Corps relied on erroneous premises or ignored relevant data (and we note that this argument concedes that there was a determination). We express no view on that matter. Our holding today is simply that the Corps did in fact make the determinations required by section 404(e).

*Id.* at 502 n.6.

Following the Court of Appeals' decision and remand, OVEC renewed its motion for Summary Judgment on its remaining claims.  As noted by the Court of Appeals, the remaining claims were based on the Corps' alleged arbitrary and capricious determination under NEPA and CWA with respect to NWP 21 (2002).  OVEC asked the court to: declare NWP 21 (2002) to be unlawful under CWA, NEPA, and the APA; vacate it and set it aside; enjoin the Corps from issuing any further NWP 21 (2002) authorizations in this District; require the Corps to complete an EIS that complies with NEPA; and award costs and expenses.  OVEC also requested that the court cancel any NWP 21 (2002) authorizations issued in this district between the time of the court's prior injunction and the date that the injunction was lifted by the Court of Appeals.

Since the Court of Appeals' decision and OVEC's renewed motion for Summary Judgment, NWP 21 (2002) expired.  On May 31, 2007, I granted OVEC's motion to file a Supplemental Complaint[8] challenging the 2007 reauthorized version of NWP 21 ("NWP 21 (2007)") [Docket 203].[9]

---

[8]     I denied their motion to challenge the newly-issued NWPs 49 and 50 because these NWPs were not sufficiently related to OVEC's original complaint.

[9]     The 2002 version of NWP 21 was issued January 15, 2002, took effect March 18, 2002, and expired March 19, 2007. 67 Fed. Reg. 2020. On March 9, 2007, the Corps reauthorized NWP 21, to become effective March 19, 2007, and expire March 18, 2012. 72 Fed. Reg. 11092 (Mar.

In its Supplemental Complaint, OVEC asserts many of the same challenges against NWP 21 (2007) that it asserted against NWP 21 (2002).  OVEC requests that the court declare NWP 21 (2007) unlawful under CWA, NEPA, and the APA.  Specifically, OVEC requests that this court find: (1) the Corps failed to respond to public comments regarding NWP 21 (2007) and effectively denied the public an opportunity for comment and review; (2) the Corps failed to comply with CWA § 404(e) and the § 404(b)(1) Guidelines because its determination that NWP 21 (2007) would have minimal individual and cumulative adverse impacts was arbitrary and capricious; (3) the Corps failed to consider impacts to the environment as a whole, in violation of CWA § 404(e); (4) the Corps' decision not to place a limit on the filling of stream beds was arbitrary and capricious; and, (5) the Corps' decision not to prepare an EIS was arbitrary and capricious because the Corps had not properly assessed the permit's cumulative impacts.  OVEC asks this court to vacate NWP 21 (2007) and remand the proceeding to the Corps; enjoin the Corps from approving any authorizations under NWP 21 (2007) in this District; enjoin the Corps from acting under NWP 21 (2007) until it completes an EIS; and award expenses and attorney's fees.

## II.    Jurisdiction

The Corps and the Intervenors[10] have challenged the justiciability of OVEC's claims.  They first argue that OVEC's challenge to NWP 21 (2002) is moot. The Intervenors further argue that

_____

12, 2007).  The Corps reauthorized the permit after the required public review and comment but made no changes to the substance of NWP 21.  72 Fed. Reg. 11092, 11117.

[10]     On April 15, 2004, I granted the motion of the West Virginia Coal Association, Kentucky Coal Association, Ohio Coal Association, Coal Operators and Associates, Inc., the National Mining Association, and Green Valley Coal Company to intervene as defendants [Docket 50].  On April 25, 2007, I granted the motion of Apogee Coal Company, LLC, to intervene as a defendant [Docket 184].

OVEC's challenge to NWP 21 (2007) is not ripe, and that OVEC lacks standing to challenge NWP 21 (2007). The Corps also asserts that some of OVEC's claims are barred by the statute of limitations. Because a court must assure itself of jurisdiction before reaching the merits of a dispute, I will address these challenges first. *See St. Paul Fire & Marine Ins. Co. v. Barry*, 438 U.S. 531, 537 (1978).

### A.  OVEC's Remaining NWP 21 (2002) Claims Are Moot

Article III of the Constitution limits the court's jurisdiction to "actual, ongoing controversies." *Honig v. Doe*, 484 U.S. 305, 317 (1988). Consequently, "an actual controversy must exist at all stages of federal court proceedings." Erwin Chemerinsky, Federal Jurisdiction § 2.5.1 (1994). The Supreme Court has described the mootness doctrine as "standing in a time frame. The requisite personal interest that must exist at the commencement of the litigation (standing) must continue through its existence (mootness)." *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 397 (1980). "A case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Powell v. McCormack*, 395 U.S. 486, 496 (1969). If a case is moot, a federal court cannot hear it. *DeFunis v. Odegaard*, 416 U.S. 312, 316 (1974).

The mootness question in this case involves OVEC's remaining claims to NWP 21 (2002) after the Fourth Circuit Court of Appeals' decision in *OVEC II*. As I have discussed, those claims include challenges to the Corps' minimal impacts determination under CWA and its insignificant cumulative impacts determination under NEPA. The Intervenors argue that OVEC's facial challenge to NWP 21 (2002) is moot because the permit became "inoperable" and "null and void" on its expiration date, March 19, 2007. (Intervenor's Supp. Br. 5 [Docket 175].) Because the Corps may not authorize any new activities after the date of expiration, they argue, there is nothing for the court

to enjoin that would provide effective relief.  (*Id.* at 5-6.)  The Intervenors further argue that OVEC's

challenge to individual authorizations made under NWP 21 (2002) is also moot because none of the

mining operations identified by OVEC as being authorized under NWP 21 (2002) currently continue

the authorized activities or seek further authorization under NWP 21 (2007).  (*Id.* at 6; Intervenor's

Resp. Opp'n OVEC's Renewed Mot. Summ. J. 3 [Docket 163].)

OVEC argues that its CWA claims are not moot because activities authorized under NWP 21

(2002) that commenced prior to the expiration date may continue for a twelve-month extension

period.  (OVEC's Supp. Mem. 1 [Docket 173].)   As observed by OVEC, the Corps retains

discretionary authority to "modify, suspend, or revoke NWP authorizations," which includes the

ability to impose "additional or revised terms or conditions on the authorization," 33 C.F.R. §

330.4(e), throughout the life of the nationwide permit, a time period which extends to the five year

permit period and the twelve-month extension.[11]  OVEC further argues that its claims are not moot

because several of the Corps' authorizations under NWP 21 (2002) were conditioned on monitoring

and mitigation plans that would continue for many years, even after the permit and its authorizations

have expired.  (*Id.* at 2.)

_____

[11]     In its entirety, the Corps' implementing regulation regarding expiration directs:

If an NWP is not modified or reissued within five years of its effective date, it
automatically expires and becomes null and void.  Activities which have commenced
(i.e., are under construction) or are under contract to commence in reliance upon an
NWP will remain authorized provided the activity is completed within twelve months
of the date of an NWP's expiration, modification, or revocation, unless discretionary
authority has been exercised on a case-by-case basis to modify, suspend, or revoke
the authorization. . . . Activities completed under the authorization of an NWP which
was in effect at the time the activity was completed continue to be authorized by that
NWP.

33 C.F.R. § 330.6(b).

I **FIND** that because the twelve-month extension period for NWP 21 (2002) ended on March 18, 2008, none of OVEC's CWA claims present a "live controversy" with respect to NWP 21 (2002). The Corps can no longer authorize any activity under that permit and indeed no activities authorized by that permit continue to be or even can be in operation at this time because the twelve-month extension period has run. Moreover, I can provide no relief to OVEC pursuant to these claims. *Incumaa v. Ozmint*, 507 F.3d 281, 286 (4th Cir. 2007) (holding that a case becomes moot when an event occurs during the pendency of a case such that the court could not grant effectual relief to the prevailing party). Though OVEC argues that a ruling in their favor "may lead the Corps to require increased stream mitigation," (OVEC's Supp. Mem. 3), such relief is by no means certain, and I do not have the authority to order additional mitigation. If a court finds that the agency's decision was arbitrary and capricious, then the court's power "is limited to vacating the unlawful agency action and remanding the matter to the agency for further proceedings, or compelling agency action that has been unlawfully withheld or unreasonably delayed." *Sierra Club v. U.S. EPA*, 162 F. Supp. 2d 406, 411 (D. Md. 2001) (citing *NRDC v. Fox*, 93 F. Supp. 2d 531 (S.D.N.Y. 2000)). Therefore, OVEC's NWP 21 (2002) claims are moot unless an exception applies.

A well-established exception to mootness exists in cases where "the challenged conduct is capable of repetition but evades review." *Kentuckians for Commonwealth, Inc. v. Rivenburgh* ("*Rivenburgh II*"), 269 F. Supp. 2d 710, 713 (S.D. W. Va. 2003) (citing *Weinstein v. Bradford*, 423 U.S. 147, 148-49 (1975)); *S. Pac. Terminal Co. v. I.C.C.*, 219 U.S. 498 (1911)). This exception applies if: "(1) the challenged action is too short in duration to be fully litigated before the case will become moot; and (2) there also is a reasonable expectation that the complaining party will be subjected to the same action again." *Id.* (citing *Spencer v. Kemna*, 523 U.S. 1, 17 (1998)). There

is no "mechanical" or "fixed" test to determine whether an activity is of such short duration that it will evade judicial review. *Nat'l Wildlife Fed. v. Costle*, 629 F.2d 118, 123 n.19 (D.C. Cir. 1980).

The challenged action in this case, the issuance of NWP 21 (2002) and the authorizations under that permit, remained justiciable for the five-year life plus twelve-month extension of the permit. *See Rivenburgh*, 269 F. Supp. 2d at 715. Though other courts have found that the lifetime of a nationwide permit is sufficient for judicial review, *see Rivenburgh II*, 269 F. Supp. 2d at 715; *see also Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 264 Fed. App'x 10, 12 (D.C. Cir. 2008), the fact that this litigation has continued for almost six years suggests that the duration of the challenged activities is too short to be fully litigated before the case becomes moot.

I need not resolve the question of duration, however, because OVEC has not shown that it reasonably will be subject to the same action again. OVEC argues that the Corps, by reissuing NWP 21 in March 2007, has shown that OVEC not only will likely be subject to the "same action" again, but in fact have actually been subjected to the same action. (OVEC's Supp. Br. 4.) According to OVEC, the Corps' decision to issue NWP 21 (2007) "contains the same infirmities as its 2002 decision." *Id.* Though OVEC raises several of the same challenges against the Corps' decision to issue NWP 21 (2007) as they did with respect to NWP 21 (2002), the new permit is based on an entirely different administrative record. Actions based on a unique record cannot properly be repetitive. Therefore, this action does not fall within the exception and I **FIND** that OVEC's CWA claims with respect to NWP 21 (2002) are **MOOT**.

Moreover, I **FIND** that OVEC's NEPA claim with respect to NWP 21 (2002) is **MOOT**. "[A] request for injunctive relief is moot when the event sought to be enjoined has occurred." *Bayou Liberty Ass'n, Inc. v. U.S. Army Corps of Eng'rs*, 217 F.3d 393, 396 (5th Cir. 2000). In this claim,

OVEC seeks to enjoin NWP 21 (2002) until OVEC completes an EIS for that permit.  NWP 21 (2002), however, has already expired.  Because NEPA requires agencies to prospectively evaluate the effect their actions will have on the environment, it would frustrate the purposes of NEPA to allow "after-the-fact critical evaluation" subsequent to the termination of the action.  *Id*. (quoting *Richland Park Homeowners Ass'n v. Pierce*, 671 F.2d 935, 940 (5th Cir. 1982)).  Accordingly, I **FIND** that OVEC's NEPA challenge to NWP 21 (2002) is **MOOT**.

### B.     OVEC Has Standing to Assert Its NWP 21 (2007) Claims

The Intervenors also argue that OVEC lacks standing to challenge NWP 21 (2007).  I **FIND** that OVEC has standing to challenge the issuance of NWP 21 (2007) because its members "visit, live near, recreate near, drive by and/or fly over areas of the state that are visibly harmed by valley fills, surface impoundments, and related surface mining activities."  *OVEC I*, 410 F. Supp. 2d at 464.  In my prior opinion, I held that OVEC had standing because (1) its members suffered an injury in fact, which was both (a) concrete and particularized since "coal refuse will be discharged into waters pursuant to specific authorizations" and (b) actual and imminent since the Corps had issued specific authorizations under NWP 21 (2002), as a result of the issuance of NWP 21 (2002); (2) "the injury was fairly traceable to the challenged action of the defendant"; and (3) "it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  *OVEC I*, 410 F. Supp. 2d at 464.

The only difference in those findings with respect to the new NWP 21 (2007) claims is that at the time OVEC filed the 2007 claims, no authorizations had occurred under NWP 21 (2007).  Nevertheless, I **FIND** OVEC's alleged injuries with respect to NWP 21 (2007) are still actual and imminent.  An injury can be actual and imminent without specific authorizations under the challenged

permit. *See La. Envtl. Action Network v. EPA*, 172 F.3d 65, 67-68 (D.C. Cir. 1999) (finding an actual and imminent injury where it is "all but certain that remediation activities will continue" and therefore it "creates a very 'substantial probability' that *some* [of the challenged] variances will be granted" by the EPA) (emphasis in original). "The organization need not prove the merits of its case—*i.e.*, that localized harm has in fact resulted from a federal rulemaking—in order to establish its standing, but it must demonstrate that there is a substantial probability that local conditions will be adversely affected and thereby injure a member of the organization." *Sierra Club v. EPA*, 292 F.3d 895, 898 (D.C. Cir. 2002) (quoting *Am. Petroleum Inst. v. EPA*, 216 F.3d 50, 63 (D.C. Cir. 2000); *La. Envtl. Action Network*, 172 F.3d at 68) (internal quotations omitted). NWP 21 (2007) became effective on March 19, 2007, and it is estimated that 217 individual authorizations are issued annually under the permit. 2007 Decision Document 21. Furthermore, Keystone Industries LLC d/b/a Keystone Development LLC applied for a site specific permit in Kanawha County, West Virginia under NWP 21 (2007). (OVEC's Exs. Supp. Mot. Summ. J. Supplemental Compl., Ex. 1) This clearly shows that there is a substantial probability that local conditions will be adversely affected and therefore OVEC will suffer an actual injury.

In addition, my determination of harm is influenced by the fact that the Corps is not required to provide the public, including OVEC, with notice of a particular permit authorization or an opportunity to challenge it. Instead, upon receipt of the authorization, permittees can immediately begin discharging dredged and fill materials without OVEC's knowledge. As I noted in *OVEC I*, the harm caused by the issuance of NWP 21 is immediate, irreversible, and difficult to monitor. *See OVEC I*, 410 F. Supp. 2d at 461. In fact, I observed first hand the swiftness with which a permittee can proceed upon receiving an authorization from the Corps. In this very case, OVEC filed a motion

for a Temporary Restraining Order attempting to halt an NWP 21 authorization allowing the discharge of over forty-nine cubic yards of dredged and/or fill material into approximately 10,899 linear feet of United States waters associated with a surface coal mining operation. (OVEC's Mot. TRO & Prelim. Inj. 1 [Docket 176].)  That motion, however, was rendered moot before I could rule on the matter because the permittee had already filled the stream.  (OVEC's Mot. Withdraw Mot. Prelim. Inj. [Docket 201].) These facts plainly show that the alleged injury is imminent.  Accordingly, I **FIND** that OVEC has suffered an injury in fact that is actual and imminent, not conjectural or hypothetical, and therefore it has standing in this matter.

### C.      OVEC's NWP 21 (2007) Claims Are Ripe

The Intervenors further argue that OVEC's CWA challenges to NWP 21 (2007) are not ripe for judicial review.  In my prior opinion, I found OVEC's similar challenge to NWP 21 (2002) was ripe.  The only difference in this case is that the record does not reflect that any individual projects have received authorization under NWP 21 (2007).[12] This does not render OVEC's claims premature because upon issuance, NWP 21 (2007) was a final agency action which immediately altered the rights of OVEC and cause an immediate injury.

The Supreme Court in *Ohio Forestry Association, Inc. v. Sierra Club*, 523 U.S. 726 (1998), set out a three-factor test for analyzing ripeness in the context of agency action. Pursuant to that test, a court must consider "(1) whether delayed review would cause hardship to the plaintiffs; (2) whether judicial intervention would inappropriately interfere with further administrative action; and (3) whether the courts would benefit from further factual development." *Ohio Forestry*, 523 U.S. at 733.

---

[12]      As I discussed above, it is highly likely that at least one project has received authorization under NWP 21 (2007) in the past two years.

As discussed above, the injury to OVEC is imminent because, I have found, OVEC has no opportunity to challenge individual authorizations once the permit has been issued.  Thus, not considering OVEC's facial challenge to NWP 21 (2007) would cause OVEC hardship, satisfying the first *Ohio Forestry* requirement.[13]  As for the second *Ohio Forestry* factor, the Corps' administrative process is complete upon issuance of the nationwide permit.  Though the Corps will authorize individual projects at a later time, such authorizations are an implementation of the permit and does not result in the refinement or amendment of the permit.  Unlike actions under the Forest Plan in *Ohio Forestry*, NWP 21 authorizations are not subject to administrative appeal.  *See* 72 Fed. Reg. at 11100 ("We do not believe it would be appropriate or necessary to establish an administrative appeal process for the NWP program, since the NWPs authorize only those activities that have minimal individual and cumulative adverse effects on the aquatic environment.").  This is, therefore, the only opportunity for judicial review of NWP 21.

---

[13]     The Intervenors rely upon the discussion of *Wilderness Society* in *OVEC I* to argue that this challenge is not ripe.  In *OVEC I*, I stated in a footnote that my finding of ripeness for site-specific authorizations complied with the Ninth Circuit Court of Appeals' analysis in *Wilderness Society*. In *Wilderness Society*, the "Ninth Circuit found the plaintiffs' 'general challenge to the Forest Plan' not to be justiciable," but determined that a site-specific challenge was justiciable. *See OVEC I*, 410 F. Supp. 2d at 463 n.4 (citing *Wilderness Society v. Thomas*, 188 F.3d 1130, 1134 (9th Cir. 1999)).

The Intervenors' reliance upon this discussion is misplaced. First, in *OVEC I*, I held, after considering the factors developed in *Abbott Laboratories* and *Ohio Forestry*, that the plaintiffs' facial challenge was ripe for adjudication.  I made this holding independent of my *Wilderness Society* analysis.  Second, *Wilderness Society*, and for that matter *Ohio Forestry,* do not stand for the proposition that facial challenges to NWPs are not justiciable if no site-specific authorizations exist. Rather, the challenged activity must either "bestow or diminish legal rights" or "plaintiffs must allege either (1) imminent concrete injuries that would be caused by the forest plan, such as 'allowing motorcycles into a bird-watching area' or 'closing a specific area to off-road vehicles,' or (2) a site-specific injury causally related to an alleged defect in the forest plan." *Wilderness Society*, 188 F.3d 1130, 1133-34 (9th Cir. 1999) (internal citations removed).

As to the third factor, no further development of the issues presented is required because "[w]hile the details of specific NWP 21 projects can be elaborate, the substance of NWP 21 is simple. Whether it complies with the Clean Water Act is a purely legal question that courts are well-equipped to consider." *OVEC I*, 410 F. Supp. 2d at 462.  Similarly, whether it complies with NEPA and the APA are pure questions of law.  Accordingly, I **FIND** that OVEC's challenge to NWP 21 (2007) is ripe for review.

### D.    OVEC's NWP 21 (2007) Claims Are Not Barred By The Statute of Limitations

Finally, the Corps argues that OVEC, by challenging the Corps' reliance on compensatory mitigation in making its NWP 21 (2007) minimal impacts determination, is actually challenging 33 C.F.R. § 330.1(e)(3). (Corps' Mem. Opp'n OVEC's Mot. Summ. J. Supplemental Compl. 26.)  That regulation allows the Corps to consider compensatory mitigation when evaluating individual authorizations under a general NWP.[14]  33 C.F.R. § 330.1(e)(3).  According to the Corps, that type

---

[14]        33 C.F.R. § 330.1(e)(3)  states:

For some NWPs involving discharges into wetlands, the notification must include a wetland delineation. The [district engineer] will review the notification and determine if the individual and cumulative adverse environmental effects are more than minimal. If the adverse effects are more than minimal the [district engineer] will notify the prospective permittee that an individual permit is required or that the prospective permittee may propose measures to mitigate the loss of special aquatic sites, including wetlands, to reduce the adverse impacts to minimal. The prospective permittee may elect to propose mitigation with the original notification. The [district engineer] will consider that proposed mitigation when deciding if the impacts are minimal. The [district engineer] shall add activity-specific conditions to ensure that the mitigation will be accomplished. *If sufficient mitigation cannot be developed to reduce the adverse environmental effects to the minimal level, the [district engineer] will not allow authorization under the NWP and will instruct the prospective permittee on procedures to seek authorization under an individual permit.*

(emphasis added).

of challenge is barred by the applicable six-year statute of limitations for suits against the United States, 28 U.S.C. § 2401(a).  (Corps' Mem. Opp'n OVEC's Mot. Summ. J. Supp. Compl. 26.)

The Corps' argument is not persuasive.  First, OVEC does not challenge the regulation in its Supplemental Complaint, but instead disputes whether the Corps' reliance on mitigation was rational in reaching its minimal impacts determination for NWP 21 (2007).  (OVEC's Mem. Supp. Mot. Summ. J. Supplemental Compl. 12-14; Supplemental Compl. ¶ 30.)  Second,  the regulation has to do with post-issuance measures—the Corps' environmental impact evaluation for individual authorizations made after the issuance of an NWP—while OVEC's challenge focuses on the Corps' pre-issuance determination of NWP 21's minimal impact.[15]  I **FIND** that OVEC is not challenging 33 C.F.R. § 330.1(e)(3), and that therefore the statute of limitations does not bar OVEC's claims.

### III.    OVEC's Challenges To NWP 21 (2007)

Because I have found that OVEC's challenges to NWP 21 (2002) are moot, OVEC's only remaining claims are those raised in its Supplemental Complaint involving NWP 21 (2007).  In that Complaint, OVEC alleges that the Corps' decision to issue NWP 21 (2007) was arbitrary, capricious, an abuse of discretion and otherwise not in accordance with the law in violation of the APA, CWA, and NEPA.  OVEC filed for summary judgment on those claims [Docket 211], and the Corps filed a cross-motion for summary judgment [Docket 221].

---

[15]    It is important to note that the minimal impact determination discussed in the regulation is distinct from the minimal impact determination made prior to the issuance of a NWP. Temporally, the former determination is made after the issuance of a NWP and during the notification period of an individual authorization while the latter is made prior to the issuance of the nationwide permit and is the determination challenged by OVEC in this case.

### A.      Standard Of Review

Summary judgment is appropriate when the pleadings and the record demonstrate that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The claims in this case, however, involve the Corps' issuance of a NWP, which is a final agency action subject to judicial review under the APA, 5 U.S.C. § 702. *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 417 F.3d 1272, 1278 (D.C. Cir. 2005); *Ohio Valley Envtl. Coal. et al. v. Aracoma Coal Co. et al. ("Aracoma Coal")*, 556 F.3d 177, 192 (4th Cir. 2009) ("Claims challenging federal agency action under CWA and NEPA are subject to judicial review under the APA.").  A court conducting judicial review under the APA does not resolve factual questions, but instead determines "whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006) (quoting *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769 (9th Cir. 1985)).  Therefore, "in a case involving review of a final agency action under the [APA] . . . the standard set forth in Rule 56(c) does not apply because of the limited role of a court in reviewing the administrative record." *Id.* at 89.  In this context, summary judgment becomes the "mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Id.* at 90.

Under the APA, a court must hold unlawful and set aside agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  In applying this standard of review, a court considers "whether the agency considered the relevant factors and whether a clear error of judgment was made." *Aracoma Coal*, 556 F.3d at 192.  The court must ensure that an agency has "examine[d] the relevant data (impacts) and articulate[d] a

satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n  v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines*, 371 U.S. at 168).

"The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. "Review under this standard is highly deferential, with a presumption in favor of finding the agency action valid." *Aracoma Coal*, 556 F.3d at 192.  Heightened deference is owed to an agency when the matter being reviewed involves "not just simple findings of fact but complex predictions based on expertise." *Id.*  Accordingly, "a reviewing court may not set aside administrative decisions 'simply because the court is unhappy with the result reached.'" *Dubois v. U.S. Dep't of Agric.*, 102 F.3d 1273, 1284 (1st Cir. 1996) (quoting *Baltimore Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 97 (1983)). The court's review must not, however, be reduced to a "'rubber stamp' of agency action." *Aracoma Coal*, 556 F.3d at 192.   The court must conduct "a 'searching and careful' inquiry of the record." *Id.* (quoting *Citizens to Preserve Overton Park*, *Inc. v. Volpe*, 401 U.S. 402, 416 (1971).

I have carefully examined the entire administrative record before the Corps at the time it made the environmental impact determinations as to NWP 21 (2007).  *See* 5 U.S.C. § 706; *see also OVEC Huntington*, 479 F. Supp. 2d at 622.  The 2007 Decision Document, prepared and issued by the Corps, summarizes the Corps' review and analysis of the direct, indirect, and cumulative impacts associated with the activities authorized under NWP 21 (2007) and describes the analysis undertaken by the Corps in order to address the requirements of NEPA, CWA, and the § 404(b)(1) Guidelines. The 2007 Decision Document identifies the factors considered by the Corps in making the minimal impact determination, any alternatives considered, and the Corps' final decision regarding issuance

of NWP 21 (2007).  Based on this record, and bearing in mind the relevant standards of review, I will turn to the merits of OVEC's claims.

### B.       The Corps Adequately Responded To Public Comments

OVEC first argues that the Corps has violated CWA and the APA by failing to respond to public comments on its minimal effects determination for NWP 21 (2007).  (OVEC's Mem. Supp. Mot. Summ. J. Supplemental Compl. 3-12.)  Specifically, OVEC asserts that the Corps failed to respond to comments identifying significant environmental impacts that would be caused by activities authorized under NWP 21 (2007).  (*Id.* at 6.)  This failure, OVEC argues, was a violation of the APA, which requires agencies engaged in rulemaking to provide an opportunity for public comment, to consider those comments, and then to "incorporate in the rules adopted a concise general statement of their basis and purpose."  (*Id.* at 4-5 (citing 5 U.S.C. § 553(c)).  The Corps argues that it did respond to OVEC's comments by conceding the uncertain success of compensatory mitigation and by "tailoring [NWP 21 (2007) to address [OVEC's] concerns."[16] (Corps' Mem. Opp'n OVEC's Mot. Summ. J. Supplemental Compl. 18-19.)

### 1.       The APA Requires The Corps To Reasonably Respond To Public Comments

The APA requires federal agencies engaged in rulemaking to provide the public with an opportunity to comment on the rule, to then consider the comments, and finally to "incorporate in the

---

[16]       OVEC also argues that the Corps' failure to respond to public comments constituted a violation of the Corps' duty "to provide the public with an opportunity to review and comment on its determination of minimal effects." (Supplemental Compl. ¶ 30.b.)  This argument is unavailing. Regardless of whether the Corps responded adequately to public comments, it is indisputable that the Corps did provide an *opportunity* for public comment.  *See* 72 Fed. Reg. 11092, 11092 (Mar. 12, 2007); *see also OVEC II*, 429 F.3d at 504 (holding that Corps satisfied its obligation to provide an opportunity for public notice and comment even though the public would not have the opportunity to comment on the Corps' individual authorizations under NWP 21 (2002)).

24

rules adopted a concise general statement of their basis and purpose."  5 U.S.C. § 553(c).  "[T]he detail required in a statement of basis and purpose depends on the subject of regulation and the nature of the comments received."  *Action on Smoking & Health v. CAB*, 699 F.2d 1209, 1216 (D.C. Cir. 1209).  "An agency need not respond to every comment, but it must 'respond in a reasoned manner to the comments received, to explain how the agency resolved any significant problems raised by the comments, and to show how that resolution led the agency to the ultimate rule."  *Id.*  A statement of a rule's basis and purpose is inadequate if it does not respond to significant public comments.  *St. James Hosp. v. Heckler*, 760 F.2d 1460, 1470 (7th Cir. 1985); *see Action on Smoking & Health*, 699 F.2d at 1217 ("The APA guarantees the public an opportunity to comment on proposed rules.  That opportunity 'is meaningless unless the agency responds to significant points raised by the public.'" (quoting *Ala. Power Co. v. Costle*, 636 F.2d 323, 384 (D.C. Cir. 1979)).

The statement of the rule's basis and purpose must also be sufficient to allow meaningful judicial review.  The purpose of the APA's "concise general statement" requirement, along with the APA's other required rulemaking procedures, is "to assist judicial review as well as to provide fair treatment for persons affected by the rule."  *Home Box Office, Inc. v. FCC*, 567 F.2d 9, 35 (D.C. Cir. 1977).  Therefore, the statement must allow a court "to see what major issues of policy were ventilated by the informal proceedings and why the agency reacted to them as it did."  *Id.* (quoting *Auto. Parts & Accessories Ass'n v. Boyd*, 407 F.2d 330, 338 (D.C. Cir. 1968)); *see also Gray Panthers Advocacy Comm. v. Sullivan*, 936 F.2d 1284, 1288 (D.C. Cir. 1991) (explaining that an agency's concise general statement must offer an explanation for the basis of its rule sufficient for a court to "consider whether the decision was based on a consideration of relevant factors." (internal quotations omitted)).

## 2.    The Corps Reasonably Responded To Public Comments

OVEC submitted comments to the Corps regarding its decision to reissue NWP 21 (2007). (OVEC's Mot. Summ. J. Supplemental Compl., Ex. 8, OVEC Comments AR-750-0 ("OVEC Comments").)  Amongst their many concerns about the permit, OVEC asserted that the activities authorized by NWP 21 (2007) would cause significant individual and cumulative impacts on the environment, including the degradation of streams, water quality, and aquatic diversity. (*Id.* at 4-11.) OVEC also asserted that there is no evidence showing the effectiveness of compensatory mitigation in achieving the minimal environmental impacts required by CWA and NEPA.  (*Id.* at 20.)  OVEC supported these assertions with numerous reports and testimony from scientists and other federal agencies.

The Corps recognized these comments in its 2007 Decision Document.  In response to comments about the significant environmental impacts caused by activities that would be authorized under NWP 21 (2007), the Corps stated:

> We believe our process for NWP 21 ensures that activities authorized by the NWP result in no more than minimal adverse impacts to the aquatic environment because each project is reviewed on a case-by-case basis and the district engineer either makes a minimal impacts determination on the project or asserts discretionary authority and requires an individual permit.

2007 Decision Document 10.  The Corps also acknowledged the commenters' criticism that compensatory mitigation is not reliable and responded:

> Compensatory mitigation is an important mechanism to help ensure that the NWPs authorize activities that result in minimal individual and cumulative adverse effects on the aquatic environmental [sic].  We acknowledge that the ecological success of compensatory mitigation projects varies widely.  Some compensatory mitigation projects fail to meet their objectives, while others do result in successful replacement of aquatic resource functions that are lost as a result of activities authorized by NWPs. We are committed to improving compliance for compensatory mitigation required for Department of Army permits, including NWPs . . . . [I]f the proposed activity will

26

result in more than minimal adverse effects on the aquatic environment after determining that compensatory mitigation is not appropriate or practicable, then an individual permit would be required.

72 Fed. Reg. 11100. *Id.* The Corps also indicated that it would strengthen its compensatory mitigation requirements by

add[ing] permit conditions that require compensatory mitigation that meets specified success criteria. The Corps will generlay require the permittee to monitor the mitigation site for five years and, if the mitigation site does not meet the success criteria at that time, remediation or additional mitigation will be required.

2007 Decision Document 9.

I **FIND** that these responses satisfy the Corps' statutory obligation to reasonably respond to public comments. The Corps acknowledged the environmental impacts identified by the commenters and explained the basis for its conclusion that compensatory mitigation would successfully minimize those impacts. The explanation is sufficient for this court to review the reasonableness of the Corps' decision. It is to that evaluation that I now turn.

## C.    The Scope Of Corps' NEPA Analysis Was Not Arbitrary And Capricious

OVEC asserts that the Corps' analysis of the environmental impacts of NWP 21 (2007) was too narrow because the Corps considered only impacts on the aquatic environment.[17]  OVEC argues that the Corps was required to consider "impacts on the riparian and upland areas buried by the valley fills." (OVEC's Mem. Supp. Mot. Summ. J. Supplemental Compl. 26.)  In response, the Corps asserts that its EA was sufficient because its regulations require the impact analysis to be based on the "specific activity requiring a [Department of Army] permit and those portions of the entire project

---

[17]     In the 2007 Decision Document, the Corps explained that: "The Corps  [sic] evaluation of coal mining activities is focused on impacts to aquatic resources . . . .  Under these circumstances, the Corps' NEPA implementing regulations clearly restrict the Corps' scope of analysis to impacts to aquatic resources."  2007 Decision Document 7.

over which the [Corps] district engineer has sufficient control and responsibility to warrant Federal review." 33 C.F.R. Part 325, App. B § 7(b)(1). The Corps argues that it "simply does not exercise sufficient control and responsibility over the entire mining project, or even over the valley fill itself . . . to expand the limited scope of review provided under the Corps' regulations." (Corps' Mem. Opp'n OVEC's Mot. Summ. J. Supplemental Compl. 37.) Thus the Corps limited its analysis to "impacts to aquatic resources." 2007 Decision Document 7.

The Fourth Circuit Court of Appeals addressed this question in *Aracoma Coal*, 556 F.3d 177. In that case, the Corps had issued individual permits pursuant to § 404(a) of CWA authorizing valley fills in connection with mountain top mining activities. The plaintiffs challenged those permits, arguing that the scope of the Corps' NEPA analysis was too narrow. The Corps had limited the scope of its NEPA analysis to the "affected waters and adjacent riparian areas," and the plaintiffs argued that the Corps "should have considered all environmental impacts caused by the fills, including the impacts to the upland valleys where the fills will be located." *Id.* at 193.

The Court of Appeals disagreed with the plaintiffs. Explaining that "[t]he specific activity that the Corps is permitting when it issues a § 404 permit is nothing more than the filling of jurisdictional waters . . . ." and that the Corps did not have sufficient control over the entire valley fill project, the court held that the Corps reasonably identified the proper scope of review pursuant to its regulations. *Id.* at 194. Therefore, the Corps' determination of the scope of its NEPA review was not arbitrary or capricious. *Id.*

Though this case involves a nationwide permit rather than an individual permit, OVEC's challenge involves the same permitted activity, the same scope of analysis, and the same Corps regulation as in *Aracoma Coal*. In light of the Court of Appeals's holding, I **FIND** that the Corps'

28

decision to limit the scope of its NEPA review to aquatic environmental impacts was not arbitrary or capricious.

### D.    The Corps' Cumulative Impacts Analysis Was Deficient Under NEPA

OVEC's other NEPA challenge in this case arises from the Corps' decision not to prepare an EIS with respect to NWP 21 (2007).  According to the Corps, it was not required to prepare an EIS because NWP 21 (2007), like all of the nationwide permits, "authorize[s] activities that have minimal individual and cumulative adverse effects on the aquatic environment . . . .  The NWPs do not reach the level of significance required for an EIS."  72 Fed. Reg. at 11095.  OVEC challenges this determination on two grounds.  First, OVEC argues that the Corps' cumulative impacts analysis did not involve the consideration of past actions and therefore could not support the Corps' insignificance determination.  (*Id.* at 27.)  Second, OVEC argues that the Corps' cumulative impacts analysis was inadequate because it relied on the efficacy of mitigation without explaining how that mitigation would in fact effectively minimize cumulative environmental impacts.  (*Id.*)

In determining whether a proposed project will have a significant impact on the environment, the Corps must consider the reasonably anticipated cumulative impacts of a proposed project.  *See* 40 C.F.R. § 1508.27(7); *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1215 (9th Cir. 2008). "Cumulative impact" is defined as "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." 40 C.F.R. § 1508.7.  "An EA may be deficient if it fails to include a cumulative impact analysis . . . ."  *Ctr. for Biological Diversity*, 538 F.3d at 1215.

The Corps' cumulative impacts analysis consisted primarily of the estimated number of times NWP 21 (2007) would be used on a national basis.  Based on the number of times NWP 21 was used in previous years, the Corps acknowledged that "[u]sing the current trend, approximately 1,085 activities could be authorized over a five year period until this NWP expires, resulting in impacts to approximately 320 acres of waters of the United States, including jurisdictional wetlands."  (2007 Decision Document 22.)  The Corps also explained that "[a]pproximately 540 acres of compensatory mitigation" would be required and would "attenuate cumulative impacts on the Nation's aquatic resources, so that the net effects on the aquatic environment resulting from the activities authorized by this NWP will be minimal." (*Id.*)  Also, if a division or district engineer were to determine that the cumulative impacts in a specific watershed or geographic area would be more than minimal, then the division or district engineer could require additional conditions to the NWP or require individual permits for activities in that area, or revoke the permit altogether.  (*Id.*)

I **FIND** that the Corps' cumulative impacts analysis with respect to NWP 21 (2007) was inadequate for two reasons.  First, the Corps failed to consider the continuing impacts of past actions which is a relevant factor for a cumulative impacts analysis.  Second, the Corps failed to explain and provide a rational explanation for its conclusion that "compensatory mitigation will attenuate cumulative impacts."  Because the Corps' inadequate cumulative impacts analysis constitutes a failure to take a "hard look" at NWP 21 (2007)'s environmental impacts as required by NEPA, I further **FIND** that the Corps' decision not to prepare an EIS was arbitrary and capricious.

Before discussing the merits of this issue, I note that this conclusion is not barred by the Fourth Circuit Court of Appeals' decision in *OVEC II*.  In *OVEC II*, the Court of Appeals held that the Corps had made the minimal impacts determination required by CWA and that the Corps needs

only to make a "reasoned prediction" regarding the permit's environmental impacts in order to satisfy CWA's substantive requirements. *OVEC II*, 429 F.3d 502, 505. The Court of Appeals did not, however, evaluate the reasonableness of the Corps' partial reliance on post-issuance procedures in the course of reaching its findings. *See id.* at 502 n.6. In fact, the Court of Appeals explicitly left open the possibility that the Corps' minimal impacts determination was arbitrary and capricious because it "relied on erroneous premises or ignored relevant data."[18] *Id.*

### 1. The Corps Failed To Consider The Effects of Past Actions As Required By NEPA

OVEC asserts that the Corps' cumulative impacts analysis for NWP 21 (2007) was deficient because the Corps failed to consider the ongoing effects of past actions. The Corps' obligation to consider the ongoing effects of past actions is part of its statutory obligation to consider cumulative

---

[18]     The Court of Appeals' latest opinion concerning § 404 permits does not affect this conclusion either. *Aracoma Coal* involved OVEC's challenges to the Corps' FONSI for four individual § 404 permits. OVEC challenged those FONSIs, arguing that the Corps, among other things, relied on unsupported mitigation measures and had conducted inadequate cumulative impact assessments of the proposed valley fills. *Aracoma Coal*, 556 F.3d at 197. The Court of Appeals' decision in that case turned on a comprehensive review of the specific mitigation plans and cumulative impacts analyses that were prepared and conducted for those specific, individual permits. *Id.* at 197-209. Thus, although the Court of Appeals articulated guiding principles about how courts should review cumulative impacts studies and mitigation proposals in the context of § 404 permits, that decision does not preclude this court's review of the Corps' cumulative impacts determination and reliance on the mitigation measures proposed for NWP 21 (2007).

Moreover, the Court of Appeals' cumulative impacts review supports my analysis in this case. In *Aracoma Coal*, the Court of Appeals explained that a "mitigated to insignificance" analysis alone does not satisfy the cumulative impacts analysis required by NEPA or CWA. *Id.* at 208. The Corps' analysis in that case, however, was sufficient. It had included both reliance and reference to other agencies' environmental review processes and had also directly addressed the anticipated cumulative impacts at the project sites. *Id.* at 208-09. The Court of Appeals concluded that the cumulative impacts analysis was not arbitrary and capricious because "the Corps had analyzed the cumulative impacts in each of the challenged permits and ha[d] articulated a satisfactory explanation for its conclusion . . . ." *Id.* at 209. In the instant matter, the Corps has neither analyzed the cumulative impacts nor "articulated a satisfactory explanation." Instead, the Corps has conducted a mere "mitigated to insignificance" analysis that is insufficient under NEPA.

impacts under NEPA.  *See* 40 C.F.R. § 1508.7.  Agencies are not required, however, to list or analyze all of the effects of individual past actions.  According to a guidance document produced by the Council on Environmental Quality, "review of past actions is required to the extent that this review informs agency decisionmaking regarding the proposed action." (Corps' Mem. Opp'n OVEC's Mot. Summ. J. Supplemental Compl., Ex. 4, Guidance on the Consideration of Past Actions in Cumulative Effects Analysis ("CEQ Guidance"), at 1.)  The Corps has substantial discretion to determine "the extent of such inquiry and the appropriate level of explanation."  (*Id.* at 2.)  The present effects of past actions are only relevant to the extent that they assist the agency in determining whether the "reasonably foreseeable effects of the agency proposal for action and its alternatives may have a continuing, additive and significant relationship to those effects."  (*Id.* at 1.)

In response to comments that the Corps' "cumulative effects analysis should include information on the past use of NWPs," 72 Fed. Reg. at 11095, the Corps replied:

> Except for a few activities, the NWPs do not authorize activities of a continuing nature.  In general, they authorize construction activities with specific start and end dates.  The NWPs can be issued for only a period of five years or less, and once an NWP expires, it cannot be used to authorize activities in waters of the United States. An activity must then be authorized by the reissued NWP, another NWP, a regional general permit, or an individual permit.  Therefore, the cumulative effects analysis is more properly focused on permits that can be used to authorize regulated activities, not past permits that have expired.

72 Fed. Reg. at 11096.  The Corps further explained this decision in its briefing in this case: "The Corps concluded that the past activities authorized by NWP 21 are not ongoing, they have no continuing relationship to activities that may be authorized under the [ NWP 21 (2007)], and are thus not properly considered in the cumulative effects analysis."  (Corps' Mem. Opp'n OVEC's Mot. Summ. J. Supplemental Compl. 22.)  The Corps further asserts that because it requires "compensatory

mitigation to offset permanent impacts to the aquatic environment . . . . the *net* impact of past

activities has no additive effect to the potential future activities."  *Id.* at 22 n.6.

The Corps committed clear error in declining to even consider the effects of past activities

based on the fact that the activities are not "continuing in nature."  Even if the individual projects (i.e.

the dredging and filling) authorized under past NWP 21 permits were complete, the regulations

require the Corps to assess the "*present effects* of past actions."[19]  (CEQ Guidance 1.) (emphasis

added).  Whether the project is complete has no bearing on whether that project results in present

effects to the environment.   Because the Corps failed to conduct any inquiry into the existence of

present effect of past actions and whether the present effects of past NWP 21 permits were relevant

to its determination of NWP 21 (2007)'s cumulative impacts, the Corps failed to complete a

cumulative impacts analysis sufficient to support a FONSI under NEPA.

I need not credit the Corps' additional argument that its decision not to consider past actions

was proper because the effects of past NWP 21 authorizations are not continuing.  (Corps' Mem.

Opp'n OVEC's Mot. Summ. J. Supplemental Compl. 22.)  There is no evidence in the Final Notice[20]

or in the 2007 Decision Document indicating that the Corps made any determination about the

continuing *effects* of past mountaintop mining discharge authorizations.  I will not accept the *post hoc*

---

[19]     In some parts of its memorandum, the Corps continues to appear to misunderstand the
relevance of past actions.  The Corps responds to OVEC's contention that it did not consider the
effects of past actions by arguing that its "decision to limit its cumulative impact analysis to the five
year period during which the NWP 21 is valid is proper and not arbitrary and capricious." (Corps'
Mem. Opp'n OVEC's Mot. Summ. J. Supplemental Compl. 37; *see also id.* at 21.)  OVEC does not,
however, contest the Corps' decision to assess the effects that will occur as a result of the current
permit.  Rather, OVEC disputes the Corps' failure to consider the contribution of ongoing effects
from past actions towards the cumulative effects that would occur during that five year period during
which NWP 21 (2007) is in effect.

[20]     The Final Notice published in the federal register is the Corps' final publication of its
NWPs, including its response to comments.  *See* 5 U.S.C. § 553(d).

rationalizations of the Corps' counsel as support for the Corps' decision.[21]  *See Cone Mills Corp. v. NLRB*, 413 F.2d 445, 452 (4th Cir. 1969).

The loss of thousands of miles of streams in Appalachia over the past twenty years, thousands of miles of streams in Appalachia, and the loss of over 200 miles of streams in West Virginia alone, vividly illustrates the impacts associated with mountaintop mining.  DPEIS at IIID-2, IIIK-49.[22] Since 2002, NWP 21 authorizations have contributed to the impact of another 140,000 feet, or twenty-six miles of stream in this state.  OVEC Comments at 5.  These losses and impacts do not exist in a vacuum; they are not corrected or cured every five years with the renewal of a new nationwide permit.  Nor do these accumulated harms become the baseline from which future impacts are measured.  Before authorizing future activities with such tremendous impacts, the Corps must at

---

[21]     At any rate, the Corps' argument is unavailing.  Though I must credit an agency's reasonable analysis based on an actual evaluation of the effects of past actions, I cannot accept a presumption, unsupported by evidence, that all past activities have been successfully mitigated or even that the mitigated impacts of past activities will not contribute to the cumulative impacts of future authorizations.  *See O'Reilly v. U.S. Army Corps of Eng'rs*, 477 F.3d 225, 235 (5th Cir. 2007) ("We cannot accept th[e] presumption . . . that when the individually 'mitigated-to-insignificant' effects of this permit are added to the actual post-dredge and fill effects of 72 other permits issued to third parties . . . that the result will not be *cumulatively* significant.").  Further, the Corps' presumption is undermined by its concession that some compensatory mitigation projects fail to meet their objectives.  *See* 72 Fed. Reg. at 11100.  The Corps may not refuse to consider the potential additive effects of past actions with current activities without first making an actual determination that the effects are irrelevant or non-existent.

[22]     This Draft Programmatic Environmental Impact Statement on Mountaintop Mining/Valley Fills in Appalachia - 2003 ("DPEIS") was prepared by the Corps, the EPA, the Department of Interior's Office of Surface Mining and Fish and Wildlife Service, and the West Virginia Department of Environmental Protection.  This document was prepared to "evaluate options for improving agency programs under [federal statutes] that will contribute to reducing the adverse environmental impacts of mountain top mining operations and excess spoil valley fills (MTM/VF) in Appalachia."  PEIS at ES-1.  The document includes a description of relevant historical data, including the historical impacts of mountaintop mining and valley fills on the Appalachian environment.  The agencies that authored the PEIS subsequently issued a Final PEIS that responded to public comments and incorporated the DPEIS.

34

least consider the present effects of past activities, which are not, in my common sense judgment, likely to have been successfully mitigated to insignificance.

## 2.    The Corps' Cumulative Impacts Analysis Was Conclusory

OVEC also challenges the Corps' cumulative impacts analysis under NEPA on the basis that it was conclusory.  (OVEC's Mem. Supp. Mot. Summ. J. Supplemental Compl. 27.)  The Corps' cumulative impacts analysis was limited to four points: (1) NWP 21 (2007) would result in impacts to approximately 320 acres of waters; (2) the Corps would require approximately 540 acres of compensatory mitigation to offset those impacts; (3) compensatory mitigation would "attenuate" the cumulative impacts and ensure minimal "net effects on the aquatic environment resulting from activities authorized by this NWP"; and (4) the district and division engineers' authority to "conduct more detailed assessments for geographic areas that are determined to be potentially subject to more than cumulative adverse effects" would ensure minimal cumulative impacts.  2007 Decision Document 21-22.  According to this analysis, it appears that the Corps implicitly conceded that the permit would cause significant cumulative environmental impacts.  Without discussing the nature of those impacts,[23] the Corps relied exclusively on the presumed success of compensatory mitigation

---

[23]    It is not evident that the Corps satisfied its obligation to discuss the cumulative impacts of NWP 21 (2007) even outside of its failure to discuss ongoing past actions.  "Although . . . 'certainty as to the cumulative effects of resource development projects require prophecy beyond the capabilities of both scientists and courts,' the Corps must at least 'mention and discuss foreseeable [cumulative impact] problems.'"  *Wyo. Outdoor Council*, 351 F. Supp. 2d at 1243 (quoting *Manygoats v. Kleppe*, 558 F.2d 556, 560-61 (10th Cir. 1997)).  Though the 2007 Decision Document and Final Notice address some of the anticipated environmental impacts of NWP 21 authorized activities, *see* 2007 Decision Document 22-37, the Corps does not discuss the impacts NWP 21 (2007) activities will have in conjunction with other foreseeable activities, including the activities of other entities.  *See* 40 C.F.R. § 1508.7.  OVEC has not, however, explicitly addressed whether the Corps sufficiently discussed cumulative impacts aside from its failure to consider relevant effects of past actions and, therefore, I will not address the issue.

and later regional determinations in deciding that NWP 21 (2007)'s cumulative impacts would be minimal.

I **FIND** that the Corps' cumulative impacts determination was conclusory because it relied on an unsupported belief in the success of mitigation measures.  Though the Corps has incorporated mitigation options and procedures for NWP 21 (2007) activities, the "mere listing" of mitigation measures and processes, without any analysis, cannot support a cumulative impacts determination. *See Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 734 (9th Cir. 2001) (internal quotations and citations omitted).  I cannot "defer to the Corps' bald assertions that mitigation will be successful." *Wyo. Outdoor Council*, 351 F. Supp. 2d at 1252.  Moreover, the Corps' reliance on generic mitigation measures, with no more applicability to NWP 21 (2007) than to any other § 404 permit, cannot support a conclusion that the Corps took a "hard look" at the foreseeable cumulative impacts of NWP 21 (2007) as required by NEPA.  This failure to "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made'" is fatal to the Corps' decision not to prepare an EIS.  *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (quoting *Burlington Truck Lines*, 371 U.S. at 168).  Because the Corps has failed to provide any support for its determination that the cumulative impacts will be minimal, I **FIND** that the Corps' determination was conclusory and that the Corps failed to consider the relevant factors in its NEPA analysis.  Therefore, the Corps' decision not to complete an EIS was arbitrary and capricious.

a.      **The Corps' Reliance On Compensatory Mitigation Was Unsupported**

When conducting a NEPA-required environmental review, an agency may consider the ameliorative effects of mitigation in determining the environmental impacts of an activity.  *See O'Reilly v. U.S. Army Corps of Eng'rs*, 477 F.3d 225, 231 (5th Cir. 2007) ("We have consistently accepted the proposition that reliance on mitigation measures may reduce a project's impacts below the level of significance."); *Sierra Club v. U.S. Army Corps of Eng'rs* ("*Sierra Club Florida*"), 464 F. Supp. 2d 1171, 1224 (M.D. Fla. 2006), *aff'd*, 508 F.3d 1332 (11th Cir. 2007); *see also Aracoma Coal*, 556 F.3d at 192 ("[A]n agency may avoid issuing an EIS where it finds that mitigating measures can be taken to reduce the environmental impact of the project below the level of significance.").  An agency's reliance on mitigation in making a FONSI, however, must be justified.  *See Sierra Club Florida*, 464 F. Supp. at 1224; *see also Hill v. Boy*, 144 F.3d 1446, 1451 (11th Cir. 1998) (explaining that where an agency relies on an assumption to reach a FONSI, the assumption must be supported by substantial evidence).  Such reliance is justified if the proposed mitigation satisfies two factors.  First, the proposed mitigation underlying the FONSI "must be more than a possibility" in that it is "imposed by statute or regulation or have been so integrated into the initial proposal that it is impossible to define the proposal without mitigation."  *Sierra Club*, 464 F. Supp. at 1225 (quoting *Wyo. Outdoor*, 351 F. Supp. 2d at 1250); *see also* Council on Envtl. Quality, Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations, 46 Fed. Reg. 18026, 18038 (March 17, 1981) ("In some instances, where the proposal itself so integrates mitigation from the beginning that it is impossible to define the proposal without including the mitigation, the agency may then rely on the mitigation measures in determining that the overall effects would not be significant . . . .").  Second, there must be some assurance that the mitigation

37

measures "constitute an adequate buffer against the negative impacts that result from the authorized activity to render such impacts so minor as to not warrant an EIS." *Wetlands Action Network v. U.S. Army Corps of Eng'rs*, 222 F.3d 1105, 1121 (9th Cir. 2000) (citing *Greenpeace Action v. Franklin*, 14 F.3d 1324, 1332 (9th Cir. 1992)). In other words, there must be some assurance that the proposed mitigation measures will be successful. Proposed mitigation measures are sufficient if they are supported by sufficient evidence, such as studies conducted by the agency, or are "adequately policed." *Id.* (quoting *Wyo. Outdoor*, 351 F. Supp. 2d at 1250.)

When an agency relies on mitigation to reduce the impacts of an activity to insignificance, "the Corps' obligation to discuss those impacts is lessened." *Id.* (quoting *Wyo. Outdoor*, 351 F. Supp. 2d at 1247). Nevertheless, the Corps must provide *some* explanation of how or why compensatory mitigation will reduce the cumulative adverse impacts on aquatic resources to insignificance. Bare assertions of mitigation are insufficient. *O'Reilly*, 477 F.3d at 235 ("[A] bare assertion is simply insufficient to explain *why* the mitigation requirements render the cumulative effects of this project less-than-significant, when considered with the past, present, and foreseeable future development in the project area." (emphasis in the original)). Though the Corps need not have developed a complete mitigation plan describing the precise mitigation measures, a "perfunctory description" or "mere listing" of mitigation measures without supporting analysis is insufficient to support a FONSI. *See Babbitt*, 241 F.3d at 734 (internal quotations and citations omitted).

In this case, the Corps relied on anticipated mitigation to reduce the cumulative impacts to an insignificant level. In conducting its analysis, the Corps did not rely on any specific mitigation measures tailored to the impacts of NWP 21 (2007), but instead relied on a review *process* that would

38

identify necessary and appropriate mitigation measures at a later time and on a case-by-case basis.[24]

*See* 72 Fed. Reg. at 11184, 11195.   The Corps explicitly expressed its reliance on this process in its *only* response to comments criticizing the absence of support for the Corps' insignificant cumulative impacts determination:

> We believe our process for NWP 21 ensure that activities authorized by the NWP result in no more than minimal adverse impacts to the aquatic environment because each project is reviewed on a case by case basis and the district engineer either makes a minimal impacts determination on the project or asserts discretionary authority and requires an individual permit.

2007 Decision Document 10; *see also id.* at 21; 72 Fed. Reg. at 11116.   The case-by-case review occurs pursuant to NWP 21's PCN requirement.[25]   As the Corps explained, the PCN process forbidding NWP 21 (2007) permittees from commencing activities prior to receiving written authorization "helps ensure that no activity authorized by this permit will result in greater than minimal adverse impacts, either individually or cumulatively, on the aquatic environment."   2007 Decision Document 5; 72 Fed. Reg. at 11114 ("We believe that regional conditions, as appropriate, and site specific review of pre-construction notification will ensure that NWP 21 authorizes activities with no more than minimal adverse effects on the aquatic environment, individually and

---

[24]      In *OVEC II*, the Fourth Circuit Court of Appeals explained that the Corps could rely on post-issuance procedures in reaching its CWA minimal impacts determination. *OVEC II*, 429 F.3d at 501 (explaining that post-issuance procedures may be necessary to "cement [the Corps] determination that the projects it has authorized will only have minimal environmental impacts.") Indeed, agencies may rely on mitigation plans that provide *post hoc* identification of applicable mitigation measures when conducting the environmental analyses required by NEPA as well. *See, e.g., Greater Yellowstone Coal.*, 359 F.3d at 1276-77; *Wyo. Outdoor Council*, 351 F. Supp. 2d at 1248. The fact that the Corps may rely on such procedures, however, does not excuse their obligation to show how the plans will mitigate the expected impacts and to explain why such mitigation plans are appropriate for the given circumstances.

[25]      As discussed above, a permittee seeking authorization under NWP 21 (2007) must file a pre-construction notification ("PCN") with the Corps and receive written authorization prior to commencing the proposed activity.

cumulatively.").  In the course of this case-by-case review, the Corps would, "[i]n order to ensure that an activity results in no more than minimal adverse effect on the aquatic environment . . . add permit conditions that require compensatory mitigation that meets specified success criteria." 2007 Decision Document 9; *see also* 72 Fed. Reg. at 11164 ("Compensatory mitigation requirements will be determined by district engineers on a case-by-case basis, after considering relevant and available information . . . .").  Therefore, the compensatory mitigation upon which the Corps relies for its cumulative impacts conclusion is selected and applied pursuant to the Corps' case-by-case review of a proposed NWP 21 (2007) project.  I now turn to whether the Corps' reliance on this process is justified.

The Corps has satisfied the first criterion to establish a justified reliance on the mitigation process because the mitigation process is "so integrated into the initial proposal that it is impossible to define the proposal without mitigation." *Sierra Club Florida*, 464 F. Supp. 2d at 12 (quoting *Wyo. Outdoor Council*, 351 F. Supp. 2d at 1250).  NWP 21 (2007) requires each permittee to file a PCN and General Condition 27 requires the Corps to consider "the need for mitigation to reduce the project's adverse environmental effects to a minimal level."  72 Fed. Reg. at 11184, 11195.  The district engineer must determine whether the activity will result in more than minimal individual or cumulative adverse environmental impacts, and then must do one of three things: (1) refuse to authorize the activity under NWP 21 (2007), (2) subject the activity to a mitigation plan that would reduce its environmental impacts to the required level, or (3) modify the activity.  *Id.*  General Condition 20 sets out factors that the district engineer must consider "when determining appropriate and practicable mitigation necessary to ensure that adverse effects on the aquatic environment are minimal."  72 Fed. Reg. at 11193.  Therefore, the case-by-case evaluation that the Corps relies upon

to mitigate the cumulative impacts to insignificance, as well as the factors to be considered in that process, are mandatory conditions that are integrated into the proposed permit that the Corps was entitled to rely upon in making its FONSI. *Sierra Club v. U.S. Army Corps of Eng'rs et al.*, 464 F. Supp. 2d at 1171, 1225 (M.D. Fla. 2006) ("[T]he mitigation measures are a mandatory condition of the permit and therefore qualify as the type of mitigation measures that can be relied upon for a finding of no significant impact." (internal quotations omitted)).

The second criterion is whether there is sufficient assurance that the measures relied upon will lead to actual mitigation. *Wyo. Outdoor Council*, 351 F. Supp. 2d at 1250. One way to provide such assurance is to present studies showing that the proposed mitigation would likely succeed. *Wyo. Outdoor Coal.*, 351 F. Supp. 2d at 1250. The Corps provided no such studies.[26] Further, the Corps' ability to provide supportive studies was inhibited by its limited identification of specific mitigation measures and assessment of the measures' likelihood of success. For instance, General Condition 20 identifies wetland restoration as applicable mitigation for wetland losses and stream restoration as applicable mitigation for stream losses. But the Corps did not provide any evidence showing that wetland restoration or stream restoration can successfully mitigate the identified losses, especially in the context of NWP 21 (2007).[27]

---

[26]    There is some evidence in the record that the PCN process in fact does not work to ensure successful mitigation. Some commenters asserted that the Corps' development of mitigation through the PCN process for previous NWP 21 activities have not been successful. *See* OVEC Notice, Ex. 7, OVEC's Comments on Corps Proposal to Reissue Nationwide Permits, at 21. Further, the Corps itself concedes that its mitigation measures are not always successful. 72 Fed. Reg. at 11100.

[27]    The Corps failed to provide such evidence despite receiving and acknowledging comments alleging that specific mitigation measures identified by the Corps, such as stream creation, were not successful. 2007 Decision Document 8. The Corps did provide more support for the establishment of riparian areas as a compensatory mitigation measure. In its Final Notice, the Corps explained the important ecological functions of riparian areas and the role riparian areas can play in

Because the Corps has not provided any evidence that its proposed mitigation process would be successful, it must at least show that its mitigation process will be adequately policed. *Wyo. Outdoor Council*, 351 F. Supp. 2d at 1250. Mitigation measures are adequately policed when they "include[] a program to monitor and ensure its effectiveness." *Nat'l Audubon Soc. v. Hoffman*, 132 F.3d 7, 18 (2d Cir. 1997); *see also Abenaki Nation of Miss. v. Hughes*, 805 F. Supp. 234, 245 (D. Vt. 1992) (assessing the adequacy of an "intensely detailed" mitigation plan including special conditions imposing specific mitigation steps for certain environmental impacts and a monitoring program). The Corps represented to commenters that monitoring would be part of the compensatory mitigation plans ensuring only minimal adverse impacts of authorized activities. *See* 2007 Decision Document 9. Neither NWP 21 (2007) nor its general conditions, however, include a requirement or protocol for monitoring mitigation sites. Moreover, monitoring plans are not part of the PCN required by General Condition 27 for NWP 21 permittees. *See* 72 Fed. Reg. at 11170 (responding to comment requesting that "detailed compensatory mitigation monitoring plans be required for activities authorized by" certain nationwide permits, including NWP 21," by explaining that "[c]onceptual mitigation plans are appropriate for submittal with [PCNs]"). Because NWP 21 does not include a monitoring plan nor require the development of a monitoring plan, I cannot find that the Corps has shown that its NWP 21 (2007) mitigation measures will be adequately policed.[28]

the restoration of the nation's waters. 72 Fed. Reg. at 11165. Without deciding whether this discussion would constitute sufficient support to justify the Corps' reliance on this specific mitigation measure with respect to NWP 21 (2007), I note that the Corps was clearly capable of expanding on its implicit conclusion that the other mitigation measures in General Condition 20 would be successful and effective.

[28]     The Corps responded to criticism of the its mitigation-based minimal impacts determination by stating:

In order to ensure that an activity results in no more than minimal adverse effect on

42

The Corps' failure to provide any evidence supporting the success of its mitigation proposal and to identify adequate policing of those activities signal the fundamental problem with the Corps' cumulative impacts analysis: the Corps has failed to provide any explanation for *why* it believes mitigation imposed through the case-by-case review of NWP 21 (2007) activities will work to mitigate the permit's cumulative impacts to a minimal level. To illuminate this problem, I will review the Corps' description of the mitigation process. First, I note that the Corps' mitigation process includes some requirements for the district engineers' assessment of environmental impacts. District engineers are required "[t]o the extent practicable, [to conduct the] evaluation . . . using a watershed approach. *Id.* District engineers are also required to "review pre-construction notifications in accordance with General Condition 20, "Mitigation," to determine whether the prospective permitee has accomplished all practicable avoidance and minimization on the project site." 72 Fed. Reg. at 11170. The Corps also provides factors that the district engineer may consider in determining the compensatory mitigation needed for an activity:

> the aquatic environment, the Corps will add permit conditions that require compensatory mitigation that meets specified success criteria. The Corps will generally require the permittee to to monitor the mitigation site for five years and, if the mitigation site does not meet the success criteria at that time, remediation or additional mitigation will be required.

2007 Decision Document 9; 72 Fed. Reg. at 11115. Because this monitoring condition is not represented in the language of NWP 21 (2007) or the general conditions, I assume that the Corps is relying solely on its regulatory requirements in making this statement. *See* 40 C.F.R. § 230.96(a). The Corps has not, however, expressed any reliance on its regulatory requirements in the course of its cumulative impacts analysis nor explained how its regulatory requirements would mitigate NWP 21 (2007)'s cumulative impacts. Unlike conditions and obligations tied to the permit, the existence of regulatory requirements applicable to all permits do not show that the Corps took a "hard look" at the permit's environmental impacts absent additional explanation. Absent such an explanation, I cannot supply a basis for the Corps' decision that the Corps itself has not given. *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)).

Compensatory mitigation requirements will be determined by district engineers on a case-by-case basis, after considering relevant and available information, such as the ecological conditions of the project site, the type of activity, the impacts of the activity on the aquatic environment and other public interest factors, and the type of aquatic resources that will be adversely affected by the NWP activity.

72 F.R.D. at 11164.

When it comes to the actual measures the district engineer should impose, however, the Corps provides a list of options with little guidance on how they should be selected or applied. For instance, General Condition 20 requires that "[c]ompensatory mitigation at a minimum one-for-one ration will be required for all wetland losses that exceed 1/10 acre and require preconstruction notification . . . ." *Id.* at 11193. Also, "[c]ompensatory mitigation plans for projects in or near streams or other open waters will normally include a requirement for the establishment, maintenance, and legal protection . . . of riparian areas next to open waters."[29] *Id.* Section (d) of General Condition 20 states that "[f]or losses of streams or other open waters that require pre-construction notification, the district engineer may require compensatory mitigation, such as stream restoration, to ensure that the activity results in minimal adverse effects on the aquatic environment." 72 F.R.D. at 11193. Section (g) allows permittees to "propose the use of mitigation banks, in-lieu fee arrangements or separate activity -specific compensatory mitigation." *Id.* at 11194. Section (h) states that: "Where certain functions and services of waters of the United States are permanently adversely affected, such as the conversion of a forested or scrub-shrub wetland to a herbaceous wetland in a permanently maintained utility line right-of-way, mitigation may be required to reduce the adverse effects of the project to the

---

[29]      Both of these mitigation measures, however, are subject to the district engineers' discretion in their use and implementation. *See* 72 Fed. Reg. at 11193. (explaining that district engineer may determine that some form of mitigation other than one-for-one compensatory mitigation is appropriate for wetland losses); *id.* at 11165 ("The establishment and maintenance of riparian areas as a compensatory mitigation requirement is at the discretion of the district engineer.").

minimal level." *Id.*  Though these sections provide some insight into when and how compensatory mitigation might be imposed, they provide no explanation for how those measures will apply to NWP 21 (2007) activities or how they will ensure the mitigation of cumulative impacts at the sites of those activities.

General Condition 27 provides even fewer specifics on the type of mitigation measures that will ensure the minimal impacts of an NWP 21 (2007) activity.  *Cf. Wetlands Action Network*, 222 at 1121 (9th Cir. 2000) (finding that mitigation measures were sufficient to support a FONSI, even though they were not fully developed, because detailed special conditions in the permit required the development of mitigation plans "according to the guidelines set forth in the special conditions."). That condition does require the district engineer, when reviewing a proposed project that would have more than minimal impacts, "to include the necessary conceptual or specific mitigation or a requirement that the applicant submit a mitigation plan that would reduce the adverse effects on the aquatic environment to the minimal level." 72 Fed. Reg. at 11196.  Such loose instructions, however, do not evidence the guarantee of successful mitigation necessary to comply with the permit requirements.[30]

The deficiency of the generalized, *post hoc* mitigation plan proposed by the Corps becomes more apparent when contrasted with other mitigation plans found by courts to be reliable.  For

---

[30]     It appears that the mitigation plan is designed to afford the district and division engineers maximum flexibility in establishing a mitigation plan appropriate for a specific NWP 21 (2007) site.  *See* 72 Fed. Reg. at 11098.  Such flexibility is surely important in light of the broad range of potential environmental conditions and impacts and I do not quibble with the Corps' decision to provide so much discretion to its district engineers.  Nevertheless, the need for flexibility does not excuse the Corps' failure to explain why such an open-ended mitigation process can ensure minimal cumulative impacts.  The Corps need not necessarily impose a more rigid mitigation plan as long as it can justify its reliance on the one that it has proposed.

instance, in *Greater Yellowstone Coalition*, the court found that the Corps had, in reaching its FONSI, reasonably relied upon a mitigation plan that had been developed after extensive study into the effects of the proposed project on bald eagles, and which included "a number of mitigation measures designed to reduce the potential impacts on bald eagles," including "close daily monitoring of active eagle nests during the construction process, with the requirement that construction be modified immediately if eagle disturbance is observed." 359 F.3d at 1274-76. Though the Corps was unable to predict the specific impacts on the eagles, the court found that Corps could justifiably rely on the comprehensive mitigation plan tailored to the identified potential impact as an "adequate buffer." *Id.* at 1277. Accordingly, the court found that the Corps had considered the relevant factors and that the FONSI was not arbitrary or capricious. *Id.* Similarly in *Wyoming Outdoor Coalition*, the court found that the Corps reasonably relied on a mitigation plan to minimize the impact of a general permit on endangered species because the Corps had detailed the potential impacts to fish and wildlife, and the mitigation plan, which provided for the individual review of proposed projects, included special notification conditions for specified geographic areas. 351 F. Supp. 2d at 1247-48. Finally, in *Sierra Club Florida*, the district court found that the Corps reasonably relied on its mitigation plan because it was scientifically supported and was "sufficiently enforceable through permit's special conditions." 464 F. Supp. 2d at 1225. In affirming the district court's conclusion, the Eleventh Circuit reiterated that "[t]he special conditions in the Permit are extensive, and we believe they reflect the Corps' efforts to design a permit that is considerate of the [CWA] and yet tailored to the unique problems presented by this large area of northwest Florida." *Sierra Club v. U.S. Army Corps of Eng'rs*, 508 F.3d 1332, 1337 (11th Cir. 2007). In each of these cases, although the Corps relied on mitigation plans that were prospective in nature, each plan demonstrated the

Corps' evaluation of specific anticipated impacts and was tailored to the specific circumstances of the permit. By contrast, the NWP 21 (2007) mitigation plan, which relies *wholly* on generalities and generic requirements, in combination with the Corps' failure to discuss with specificity any of the anticipated cumulative impacts that may result from NWP 21 (2007), cannot show that the Corps took a "hard look" at the cumulative impacts of the permit.

Because the Corps' list of mitigation measures and general mitigation plan requirements do not provide any explanation or analysis showing why mitigation at NWP 21 (2007) sites will successfully minimize the cumulative impacts from the permit, I am left with nothing but the Corps' unsupported belief in that conclusion. The Corps' conclusory statement is rendered even less convincing by the Corps' concession that mitigation plans sometimes fail. 72 Fed. Reg. At 11100 ("We acknowledge that the ecological success of mitigation projects varies widely. Some compensatory mitigation projects fail to meet their objectives, while others do result in successful replacement of aquatic resource functions that are lost as a result of activities authorized by NWPs.") The Corps did repeatedly express its commitment to the success of mitigation and a promise to increase its efforts. *See id.* ("We are committed to improving compliance for compensatory mitigation . . . ."); *id.* at 11115 ("The Corps has increased its compliance efforts to ensure that projects authorized by DA permits are constructed as authorized and that mitigation is successful."). Yet the Corps did not describe the increased efforts anywhere in its Final Notice or 2007 Decision Document.[31] The Corps' expressed commitment and increased effort to improve compliance cannot

_____

[31]      The Corps asserts that it added compensatory mitigation requirements, including additional mitigation and monitoring conditions to "tailor[] the 2007 NWP to address [OVEC's] concerns." (Corps' Mem. Opp'n OVEC's Mot. Summ. J. Supplemental Compl. 19.) But NWP 21 (2007) was reissued as proposed with no changes. 72 Fed. Reg. at 11117. Accordingly, it is clear that the Corps did not change NWP 21 (2007) in any way in response to public comments.

substitute for a reasoned explanation of why it believes the proposed mitigation process will successfully ensure minimal cumulative impacts.  Though this court will not require the Corps to make an *ex ante* guarantee that its mitigation process will be successful, the Corps must offer something more substantive than a mere promise.  Because the Corps has not demonstrated any assurance that the post-issuance review of a proposed activity will ensure that a proposed project has less than significant environmental impacts, the Corps' statements are "little more than its own promise to obey the law."  *OVEC II*, 429 F.3d at 502 (explaining that the Corps must rely on more than just post-issuance minimal impacts analyses in reaching its CWA-required minimal impacts determination); *see also Babbitt*, 241 F.3d at 735 (explaining that the Corps' EA was uncertain as to effects of proposed mitigation and therefore the "EA's speculative and conclusory statements [were] insufficient to demonstrate that the mitigation measures would render the environmental impact so minor as to not warrant an EIS.").

In short, "[a] 'mitigated to insignificance' analysis does not suffice to demonstrate an absence of cumulatively significant impacts."  *Aracoma Coal Co.*, 556 F.3d at 207 (holding that Corps' cumulative impacts determination was not arbitrary because it relied on findings by other agencies and directly addressed cumulative impacts in addition to relying on mitigation) (quoting *O'Reilly*, 447 F.3d at 234-35); *Wyo. Outdoor Council*, 351 F. Supp. 2d at 1248 (explaining that Corps' reliance on mitigation measures in conjunction with acknowledgment of specific impacts caused by the authorized activity was not arbitrary).  Though I recognize the difficulty of predicting cumulative impacts that will occur across the country and that the Corps is not required to make certain predictions about those impacts or the success of mitigation, this difficulty does not permit the Corps to avoid its NEPA obligations.  NEPA does not distinguish its requirements based on the ease of

compliance. Nor does it excuse the Corps' unexplained and unsupported reliance on a generic mitigation process as a substitute for evaluating the cumulative impacts of a § 404 permit. "Mitigation measures [must] be supported by substantial evidence in order to avoid creating a temptation for federal agencies to rely on mitigation proposals as a way to avoid preparation of an EIS." *Nat'l Audubon Soc. v. Hoffman*, 132 F.3d 7, 17 (2d Cir. 1997). I **FIND** that the Corps' reliance on prospective mitigation in its cumulative impacts analysis was unjustified and in violation of NEPA.

### b. The Corps' Reliance On Regional Assessments Does Not Support Its Cumulative Impacts Determination.

The Corps' reliance on district and division engineers' review of cumulative impacts on a regional or watershed basis cannot save the Corps' analysis. A deferred determination of NWP 21 (2007)'s cumulative impacts on a regional or watershed basis or for an individually authorized activity cannot compensate for the absence of a nationwide cumulative impacts determination. "By their very nature, the 'cumulative impacts' of a general permit cannot be evaluated in the context of a single project." *Wyo. Outdoor Council*, 351 F. Supp. 2d at 1243. Although a case-by-case or regional cumulative effects determination allows the Corps to identify the cumulative impacts of the individual activity or cluster of activities permitted in a region, it does not provide any information about the cumulative impacts of the *nationwide permit*. NWP 21 (2007) may have cumulative consequences by virtue of its being authorized on a nationwide scale. If the Corps believes the permit will not have nationwide cumulative impacts, then it must say so and explain its reasoning. It may not simply decide to conduct the analysis on a smaller scale than its proposed activity. Accordingly, the Corps' conclusory reliance on regional and watershed cumulative impacts analyses in making its FONSI was unjustified.

### c.      The Corps' FONSI Was Arbitrary And Capricious

For the reasons discussed above, I **FIND** that the Corps' reliance on compensatory mitigation and regional assessments in reaching its FONSI was arbitrary and capricious under the APA.  The Corps did not explain its conclusion or articulate a "rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (quoting *Burlington Truck Lines*, 371 U.S. at 168).  The Corps does not identify the nature of the anticipated impacts, the measures that will address those impacts, or the likelihood that the mitigation will be successful.  Instead, the Corps presumes, on this record, that whatever the impacts, it will be able to mitigate them successfully and further, that the procedures incorporated into the NWP 21 (2007) authorization process are sufficient to ensure that success.  An analysis based on presumptions at every step cannot support any sort of conclusion and especially not the Corps' FONSI.

I recognize that the Corps' inability to specify mitigation measures and to evaluate their success stems from the Corps' initial difficulty in discussing with any detail the anticipated cumulative impacts of NWP 21 (2007).[32]  Indeed, the Corps need not and cannot anticipate every possible impact.  As the Court of Appeals reminded this court, "it is impossible for the Corps' *ex ante* determination of minimal impacts to be anything more than reasoned predictions." *OVEC II*, 429

---

[32]      As the Corps explains with respect to NWP 21 (2007):

> [T]his [environmental] assessment must be speculative or predictive in general terms.  Since NWPs authorize activities across the nation, projects eligible for NWP authorization may be constructed in a wide variety of environmental settings. Therefore, it is difficult to predict all of the indirect impacts that may be associated with each activity by an NWP.

2007 Decision Document at 20; *see also OVEC II*, 429 F.3d at 501 (explaining the difficulty of accurately predicting impacts when the Corps issues a nationwide permit like NWP 21 because the Corps "must attempt to forecast the environmental effects the authorized activities could have if undertaken anywhere in the country under any set of circumstance.").

F.3d at 501.  I am further mindful that "proposed mitigation measures need not be laid out to the finest detail." *O'Reilly*, 477 F.3d at 231.  But neither of these considerations permit the Corps to abdicate its duty under NEPA to take a "hard look" and reach a reasoned, rather than a conclusory, determination about the environmental impacts of a proposed project.  Though the circumstances inherent to a § 404 nationwide permit may lower the standard of the Corps' evaluation to some extent, the Corps must do more than provide assumptions about the success of a generic mitigation plan.  The permit is **REMANDED** to the Corps for proceedings including the preparation of new EA, a new FONSI, or an EIS.

> **E.     The Corps' Individual Impacts Determination Under CWA Was Reasonable, But The Corp's Cumulative Impacts Determination Under CWA Was Arbitrary And Capricious**

OVEC next challenges both the Corps' individual minimal adverse environmental effects determination and its minimal cumulative environmental effects determination under CWA.  CWA requires two distinct minimal impacts determinations.[33]  33 U.S.C. § 1344(e).  The first is a

---

[33]     Neither CWA nor the Corps' regulations define the terms "minimal" or "environmental."  The Corps has declined to define "minimal effects" as it applies to nationwide permits because "[a]quatic resource functions and values vary considerably across the country, and the minimal adverse effects criterion for general permit must be subjectively applied by district engineers." 67 Fed. Reg. at 2075.  OVEC does not allege that the Corps has improperly interpreted the term minimal, but argues that the Corps' determination that the effects were minimal was arbitrary and capricious.

The parties do dispute, however, the meaning of the term "environment."  OVEC argues that in order to satisfy CWA, the Corps must look at the effect the activities will have on the entire environment, that is, the aquatic and non-aquatic environment. The Corps admits that it only considered the "aquatic environment" but argues that the statutory language only requires consideration of the aquatic environment.  In addition, the Corps cites the 404(b)(1) Guidelines, which require only that the cumulative effect on "water quality and the aquatic environment" be minimal. 40 C.F.R. § 230.7(a).  Here, OVEC does not challenge the Corps' interpretation of the term "environmental" in CWA, alleging only that the Corps' action failed to satisfy the statute.  Other courts have noted the discrepancy between the language of CWA and the § 404(b)(1) Guidelines with

determination that the individual impacts of each authorized activity will be minimal.  *Id.*  The second is that the cumulative impacts of all of the authorized activities, collectively, will be minimal.  *Id.* In reaching this determination, the Corps must "set forth in writing an evaluation of the potential individual and cumulative impacts of the category of activities to be regulated under the General permit."  40 C.F.R. § 230.7(b); *see also id.* § 230.11(h).

I **FIND** that the Corps' individual impacts determination was reasonable because it constituted a reasoned prediction based on several factors, including the general conditions attached to NWP 21 (2007), the contribution of other agencies' environmental review processes, an evaluation of the impacts of individual authorizations, and also, the PCN process.  I also **FIND**, however, that the Corps' cumulative impacts determination was arbitrary and capricious under the APA, because unlike the individual impacts determination, the Corps' cumulative impacts determination relied exclusively on a mitigation process with no demonstrable insurance of success.  The Corps cannot forecast the cumulative impacts of the NWP 21 (2007) authorizations based solely on that unsupported mitigation plan.  Because the Corps' cumulative impacts determination was arbitrary and capricious, this matter is **REMANDED** for further findings.

I note that OVEC's challenge to Corps' CWA determinations requires a distinct analysis from that of the Corps' NEPA's cumulative impacts determination.  Significantly, my analysis of OVEC's

---

respect to the term "environment" but have declined to rule decisively on the issue.  *See*, *e.g.*, *Sierra Club Florida*, 464 F. Supp. 2d at 1198 n.39 ("In light of the Corps' explanation and its history of addressing only direct effects to wetlands and water bodies and indirect effects to other environmental features in this context, the Corps' interpretation is persuasive."); *Wyo. Outdoor Council*, 351 F. Supp. 2d at 1255 n.11 ("This Court could find no case that addressed this discrepancy or how the standard should be applied.  Nor will the Court address it here. . . ."). While the court acknowledges the seeming discrepancy between the language of CWA and that of the § 404(b)(1) Guidelines, the court does not find it necessary to address this issue.

CWA claims is informed by the Fourth Circuit Court of Appeals's opinion in *OVEC II*, which did not discuss NEPA, but did provide guidance as to the proper analysis of the Corps' CWA impact determinations. In that case, the Court of Appeals identified the types of factors that could support those determinations. These factors included NWP 21 (2002)'s incorporation of the Surface Mining Control and Reclamation Act ("SMCRA") requirements and general nationwide permit conditions, consideration of the "nature of the coal-mining activities authorized by NWP 21 [(2002)]," and information from previous NWP 21 usage. 429 F.3d at 499.

The Court of Appeals also explained that the Corps' minimal impacts determination would be inherently uncertain in the context of the nationwide permit because "the Corps must attempt to forecast the environmental effects the authorized activities could have if undertaken anywhere in the country under any set of circumstances." *OVEC II*, 556 F.3d at 501. Accordingly, the court held that the Corps' determination need only be a "reasoned prediction" or "forecast" of the permit's environmental impacts. *Id.*

### 1. The Corps' Individual Impacts Determination Under CWA Was Reasonable

OVEC argues that the Corps failed to comply with CWA § 401(e) because its determination that NWP 21 (2007) would only have minimal individual adverse environmental impacts was arbitrary and capricious. Specifically, OVEC argues that the Corps' determination relied on compensatory mitigation to offset adverse impacts without providing any evidence that compensatory mitigation could successfully offset those impacts. (OVEC's Mem. Summ. J. Supplemental Compl. 12-13.) Pursuant to *OVEC II*, the Corps did make this statutorily required minimal impact

determination before issuing NWP 21 (2007).  *OVEC II*, 429 F.3d  at 505.  The remaining question is whether that determination was arbitrary and capricious.

The record shows that the Corps did heavily rely on mitigation in reaching its minimal impacts determination for NWP 21 (2007).  The Corps declared that "the discharges authorized by this NWP comply with the [CWA], with the inclusion of appropriate and practicable conditions, including mitigation, necessary to minimize adverse effects on affected aquatic ecosystems."  2007 Decision Document 37.  The central role of mitigation in the Corps' determination was further highlighted in its response to public comments.  72 Fed. Reg. At 11100.    The Corps' reliance on compensatory mitigation was inextricably connected to a reliance on the PCN procedures.  The Corps explained that the PCN requirement for NWP 21 (2007) authorizations "helps ensure that no activity authorized by this permit will result in greater than minimal adverse impacts, either individually or cumulatively, on the aquatic environment, because it requires a case-by-case review of each project."  2007 Decision Document 5.  As the Corps further elaborated:

> The pre-construction notification requirements of all NWPs allow for case-by-case review of activities that have the potential to result in more than minimal adverse effects to the aquatic environment.  If the adverse effects on the aquatic environment are more than minimal, then the district engineer can either add special conditions to the NWP authorization to ensure that the activity results in no more than minimal adverse environmental effects or exercise discretionary authority to require an individual permit . . . .  NWP 21 requires written verification before the project can proceed.  This ensures that adequate time is available to the Corps to review the extensive documentation that pre-construction notifications for NWP 21 often include, coordinate with other agencies as necessary, and determine whether exercise of discretionary authority is necessary to ensure no more than minimal effects.

2007 Decision Document 6.  Indeed, this reference to the PCN process was the Corps' sole response to public comments criticizing the Corps as having "no reasoned basis or substantial evidence to

support its determinations that the individual or cumulative environmental impacts associated with

NWP 21 [(2007)] will be minimal":

> We believe our process for NWP 21 [(2007)] ensures that activities authorized by the NWP result in no more than minimal adverse impacts to the aquatic environment because each project is reviewed on a case-by-case basis and the district engineer either makes a minimal impacts determination on the project or asserts discretionary authority and requires and individual permit.  Additionally, as noted above, division engineers can add regional conditions to any NWP to further restrict the use of the NWP to ensure that the NWP authorizes only activities with no more than minimal adverse effects on the aquatic environment in a particular watershed or other geographic region.

*Id.* at 10; *see also* 72 Fed. Reg. at 11116.[34]

Although the Corps relied most heavily on the PCN, it did consider other factors.  First, the

Corps relied on the application of the general conditions to all nationwide permits to limit the adverse

environmental impacts of NWP 21 (2007).  In response to comments expressing concern that NWP

21 (2007) projects would impact "water supplies and drinking water, downstream water uses, and

recreational opportunities such as fishing . . . .  water pollution, the effects of burying streams that

support aquifers, and loss of streams and wetlands," the Corps stated: "[NWP 21 (2007)] requires

compliance with all of the general conditions for the NWPs, which address many of these concerns.

_____

[34]      The Corps did explain the benefits of making minimal impacts determinations on an individual-authorization basis: "The pre-construction notification and discretionary authority processes provide flexibility to the Corps regulatory program, by allowing the Corps to focus its limited resources on activities that have the potential to have more than minimal adverse effects on the aquatic environment."  72 Fed. Reg. at 11098 (responding to comments objecting to the expansion of pre-construction notification requirements in NWPs other than NWP 21).  The Corps further explained the importance of relying on regional conditions: "Regional conditions are important tools for protecting endangered and threatened species, designated critical habitat for those species, essential fish habitat, historic properties, and other important resources."  72 Fed. Reg. at 11099 (responding to comments objecting to regional condition requirements).  These statements do not, however, provide any explanation about how the PCN would ensure minimal impacts.

Additionally, many of these factors will be evaluated during the project specific evaluation."  2007

Decision Document 11; *see also* 72 Fed. Reg. At 11116.[35]  The Corps also relied on environmental

review processes conducted by other agencies to help ensure that NWP 21 (2007) activities would

only have a minimal impact.  In the 2007 Decision Document, the Corps stated a general belief that

"the analyses and environmental protection performance standards required by SMCRA in

conjunction with the pre-construction notification requirement are generally sufficient to ensure that

NWP 21 activities result in minimal individual and cumulative adverse impacts on the aquatic

environment."[36]  2007 Decision Document 5; *see also id.*  at 24 (finding that review under SMCRA

will help ensure minimal impacts to historic properties).  The Corps further considered the

environmental impacts pursuant to its statutorily required public interest and § 404(b)(1) Guidelines

review, including impacts on water circulation, fluctuation, and salinity, conservation, flood hazards,

endangered species, and aquatic organisms.[37]

---

[35]     *See also* 2007 Decision Document 23 (finding that General Condition 6 would control adverse effects to the chemical composition of the aquatic environment); *id.* at 24 (finding that General Condition 18 prevents authorization of activities affecting historic places); *id.* (finding that General Conditions 2, 3, 4 and 5 will help reduce adverse effects on fish and wildlife values); *id.* at 25 (finding that General Conditions 9 and 10 will help ensure minimal adverse impacts on flood hazards); *id.* (finding that General Condition 1 will prevent more than minimal adverse impacts on navigation activities); *id.* at 32 (finding that General Condition 17 prevents activities that will affect endangered species or critical habitats) .

[36]     The Corps also acknowledges that SMCRA "does not remove the need . . . for independent authorization under Section 404 of the Clean Water Act.  Consequently, this NWP does not duplicate the SMCRA permit process."  2007 Decision Document 8, 11-2 ("The Corps does not assume that other state or Federal agencies conduct a review that is comparable to the section 404(b)(1) Guidelines.").

[37]     *See* 2007 Decision Document 22 (finding that the adverse effects of NWP 21 activities on conservation will be minor; finding that NWP 21 activities would alter aesthetics of waters and surrounding lands; finding that NWP 21 activities will have minor adverse effects on the general environment and that compensatory mitigation will ensure minimal environmental impacts; finding that NWP 21 activities may destroy wetlands and that compensatory mitigation may be necessary to

As in *OVEC II*, the Corps did not rely *solely* on the PCN process in reaching its minimal individual impacts determination with respect to NWP 21 (2007), but also considered the applicability of the SMCRA requirements and general conditions, as well as its review of public interest and § 404(b)(1) Guidelines factors.  I cannot find that the information is insufficient to support a "reasoned prediction."  Accordingly, I **FIND** that the Corps' § 404(e) individual minimal impacts determination was not arbitrary or capricious.

### 2.     The Corps' Cumulative Impacts Determination Under CWA Was Arbitrary And Capricious

OVEC's objections to the Corps' CWA cumulative impacts determination echoes its objections to the Corps' NEPA cumulative impacts analysis, which I have found to be deficient.

ensure minimal adverse effects on wetlands) *id.* at 24 (finding that NWP 21 activities will impact fish and wildlife values and that compensatory mitigation would offset losses of waters and provide fish and wildlife habitats); *id.* at 25 (finding that NWP 21 activities may affect floodplain values but that a combination of compensatory mitigation and general permits will minimize those effects); *id.* at 26 (finding that NWP 21 activities will only have minor effects on shore erosion and accretion); *id.* (finding that NWP 21 activities may change or permanently eliminate some recreational uses of the area); *id.* (finding that NWP 21 activities may adversely affect surface water and groundwater supplies but that a combination of compensatory mitigation, general conditions and district engineer review "will help maintain or improve the quality of surface waters"); *id.* at 26-27  (finding that NWP 21 activities will have adverse effects on water quality and that compensatory mitigation may be required to ensure a minimal adverse effect on water quality, including measures such as wetland and riparian area restoration); *id.* at 29 (finding that "[m]itigation required by the district engineer will ensure that the adverse effects on the aquatic environment are minimal."); *id.* at 31 (finding that NWP 21 activities will alter substrate of filled waters); *id.* at 31 (finding that NWP 21 activities may temporarily increase water turbidity); *id.* at 31-32 (finding that NWP 21 activities may affects some characteristics of water); *id.* at 32 (finding that NWP 21 activities may adversely affect the movement of water); *id.* (finding that NWP 21 activities will not adversely affect normal patterns of water level fluctuations); *id.* (finding that NWP 21 activities are unlikely to adversely affects salinity gradients); *id.* at 34-35 (finding that NWP 21 activities may affect aquatic organism habitats but that regional condition on the NWP and general conditions will help ensure minimal impacts to aquatic organisms); *id.* at 35 (finding that NWP 21 activities will affect non-aquatic wildlife but that compensatory mitigation will offset those impacts); *id.* at 36 (finding that NWP 21 may authorize activities in riffle and pool complexes but that district engineers can require such activities to obtain individual permits if they will result in more than minimal adverse environmental impacts).

First, OVEC argues that the Corps had no reasonable basis for its determination.  (OVEC's Mem. Supp. Mot. Summ. J. Supplemental Compl. 14.)  Second, OVEC argues that the Corps did not respond meaningfully to public comments concerning NWP 21 (2007)'s cumulative impacts.  (*Id.*)  Because I have already concluded that the Corps' response to public comments was adequate, I will now only address the Corps' cumulative impacts determination.

As an initial matter, I note that the phrase "cumulative impacts" has a different meaning within the context of CWA § 404 than it does under NEPA.  Under CWA:

> Cumulative impacts are the changes in an aquatic ecosystem that are attributable to the collective effect of a number of individual discharges of dredged or fill material. Although the impact of a particular discharge may constitute a minor change in itself, the cumulative effect of numerous such piecemeal changes can result in a major impairment of the water resources and interfere with the productivity and water quality of existing aquatic ecosystems.

40 C.F.R. § 230.11.  Thus, while cumulative impacts under NEPA includes the impacts caused by related activities conducted by other persons and entities, under CWA, it only includes the "collective impacts" from the individual discharges of dredged or fill material authorized by the permit.

This difference in definition means that the Corps' CWA cumulative impacts determination is less infirm than its NEPA analysis because the Corps' failure to consider factors such as the continuing effects of past actions is irrelevant under the CWA.  Indeed, the Corps' estimate based on previous NWP 21 use of the total impacted acreage is a reasonable prediction of the permit's cumulative impacts.  *See* 2007 Decision Document 22.  But the Corps' conclusion that these cumulative impacts would be minimal relied solely on the prospect of successful mitigation.  Though the Corps' discussion of the general conditions, public interest review factors, and § 404(b)(1) Guidelines is informative with respect to the individual impacts of specific authorizations, it does not provide any information about the cumulative impacts of those authorizations.  Accordingly, the

Corps' minimal cumulative impacts determination is also faulty under CWA because, like its NEPA cumulative impacts analysis, it is based on the success of a mitigation process whose success is not supported by the Corps' analysis. *See Wyo. Outdoor Council*, 351 F. Supp. at 1249 (explaining that the Corps' finding that a loss of seven acres per year of wetlands was not in and of itself arbitrary and capricious but that "[i]f . . . the Corps' reliance on mitigation measures was not justified, the Court can only assume that the impacts . . . without the mitigation measures would result in significant impacts, and the issuance of a FONSI was inappropriate."). For the reasons discussed above in my NEPA analysis, I **FIND** that the Corps' minimal cumulative adverse impacts determination under CWA was arbitrary and capricious. Because the Corps' required determinations under CWA § 404(e) were arbitrary and capricious, the Corps' decision to issue NWP 21 cannot stand.

### F.   The Corps' Decision Not To Impose A Limit on Streams Was Not Arbitrary And Capricious

OVEC also argues that the Corps arbitrarily and capriciously decided not to impose a quantifiable limit on the filling of perennial streams.[38]   (OVEC's Mem. Supp. Mot. Summ. J. Supplemental Compl. 23-25.) OVEC observes that five other nationwide permits, NWPs 29, 39, 40, 42 and 43, cannot be used to fill more than 300 feet of perennial stream, but that no such limit exists for NWP 21 (2007). (*Id.* at 23) Because the Corps has failed to explain why it has treated these permits differently, OVEC argues, its decision was arbitrary and capricious. (*Id.* at 25.)

The Corps responds that the "[d]ifferences in the nature of the activities, as well as differences in the circumstances in which the fill occurs, merit different regulatory approaches [to nationwide

---

[38]      "A perennial stream has flowing water year-round during a typical year.  The water table is located above the stream bed for most of the year.  Groundwater is the primary source of water for stream flow.  Runoff from rainfall is a supplemental source of water for stream flow."  72 Fed. Reg. at 11197.

permits.]" (Corps' Mem. Opp'n OVEC's Mem. Supp. Summ. J. Supplemental Compl. 31.)  The Corps observes that the forty-nine nationwide permits all have different fill limits: some have limits based on acreage, others on yards of fill or the size and location of the project, and some have no limits at all.  (*Id.* at 32.)

The Corps received numerous public comments concerning the imposition of a limit on the amount of fill that could be permitted under NWP 21 (2007).  Many commenters suggested the inclusion of a 300 linear foot on filling perennial streams and other acreage or geography based limits. 2007 Decision Document 4; *see also* OVEC's Notice Filing Excerpts Administrative Record, Ex. 5 at 8; Ex. 6 at 16-17; Ex. 7 at 28-29.  Others objected to the imposition of the limit.  2007 Decision Document 4; see *also* Corps' Mem. Opp'n OVEC's Mot. Summ. J. Supplemental Compl., Ex. 2 at 5; Ex. 3 at 5-8, 12.  In response to these comments, the Corps explained that the fill limit was not necessary because (1) environmental standards required by SMCRA generally ensured that NWP 21 (2007) activities would not result in greater than minimal adverse impacts on the environment, (2) the PCN requirement ensured that no NWP 21 (2007) activity would cause greater than minimal adverse impacts, and (3) that the Corps had no basis for imposing a nationwide limit on stream fill in light of the "vast differences" in coal mining techniques across the nation.  2007 Decision Document 5.

I **FIND** that the Corps' decision not to impose a limit on stream fill was reasonable.  The Corps considered the comments both supporting and opposing the limit and provided a reasoned response.  Notably, NWP 21 (2007) requires a PCN *and* written authorization prior to commencing activity.  2007 Decision Document 1; 72 Fed. Reg. at 11184.  NWPs 29, 39, 40, 42, and 43, which OVEC identified as prohibiting the fill of more than 300 feet of perennial streams, similarly require

a PCN, but do not require written authorization.  72 Fed. Reg. at 11189.  Consequently, permittees

seeking authorization under those permits may commence activity thirty days after filing the PCN

if they have not received written authorization from the Corps.  33 C.F.R. § 330.1.  According to the

Corps, the requirement that permittees seeking authorization under NWP 21 (2007) activities must

wait for the written authorization ensures  "environmental protection for projects authorized by this

permit."  2007 Decision Document 5.  Because the Corps has considered the relevant factors and

offered a rational explanation for its decision, I **FIND** that the Corps' decision not to impose a limit

on stream fill caused by NWP 21 (2007) activities was not arbitrary and capricious.

## IV.    CONCLUSION

The Corps may not use the nationwide permit process to circumvent its statutory obligations

to thoroughly examine the environmental impacts of permitted activities.  In this case, the Corps

failed to evaluate the cumulative impacts of NWP 21 (2007) and that failure renders its permitting

decision arbitrary and capricious under the APA.

For the reasons discussed above, the plaintiffs' Motion for Summary Judgment on Their

Supplemental Complaint is **GRANTED** [Docket 211] and the Corps' Cross-Motion for Summary

Judgment on the Supplemental Complaint is **DENIED** [Docket 221].  Further, because I **FIND** that

OVEC's claims based on the Corps' decision to issue NWP 21 in 2002 are moot, both OVEC's

Renewed Motion for Summary Judgment on Their Remaining Claims [Docket 155] and the Corps'

Cross-Motion on the Remaining Claims [Docket 165] are **DENIED as moot**.

OVEC has requested several forms of relief, including an injunction against further

authorizations under NWP 21 (2007).  In *OVEC I*, I confined the scope of injunctive relief to the

Southern District of West Virginia because "injunctive relief should be no more burdensome to the

defendant than necessary to provide complete relief to the plaintiffs," and "the plaintiff organizations here are West Virginians . . . who 'visit, live near, recreate near, drive by and/or fly over areas of the state that are visibly harmed by valley fills, surface impoundments, and related surface mining activities." 410 F. Supp. 25 at 470.   That same reasoning applies in this case.   Accordingly, I **VACATE** NWP 21 (2007) and **REMAND** this matter to the Corps for further proceedings consistent with this opinion.  I **ENJOIN** the Corps from issuing authorizations pursuant to NWP 21 (2007) in the Southern District of West Virginia until the Corps prepares a revised EA or an EIS and also determines that NWP 21 (2007) will not have adverse cumulative impacts as required by CWA § 404(e) and **ENJOIN** the Corps and the Intervenors from all activities authorized under NWP 21 (2007).

OVEC has additionally requested attorney's fees and costs pursuant to 28 U.S.C. § 2412(d)(1).  Section 2412(d)(1)(A) provides that

> a court shall award to a prevailing party other than the United States fees and expenses . . . incurred by that party in any civil action . . . including proceedings for judicial review of agency action, brought by or against the United States . . . unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust.

I **FIND** that the plaintiff's application for fees is premature under § 2412(d)(1)(B).  Section 2412(d)(1)(B) requires that a party submit an application to the court for fees and demonstrate that it is a prevailing party under this section within thirty days of final judgment in an action.  With that application, the plaintiff must submit an itemized statement of time and rates, and shall allege that the position of the United States was not substantially justified.  28 U.S.C. § 2412(d)(1).  Only then will the court make a determination as to fees and costs.  Accordingly, OVEC's request for attorney's fees and costs is **DENIED without prejudice**.

The court **DIRECTS** the Clerk to send a copy of this Order to Counsel of record and any unrepresented party.  The court further **DIRECTS** the Clerk to post a copy of this published opinion on the court's website, www.wvsd.uscourts.gov.

ENTER:        March 31, 2009

Joseph R. Goodwin, Chief Judge